(No. 17704.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM J. CAPPALLA, Plaintiff in Error.

*Opinion filed December 23, 1926.*

1. CRIMINAL LAW—*extent to which complaint of prosecutrix is admissible in rape case.* While in a prosecution for rape evidence of a complaint made by the prosecuting witness to a third person is admissible in corroboration of her testimony as to the commission of the crime on the ground that it is the natural and spontaneous expression of outraged feeling, yet if the complaint is made in response to questions it is not admissible, and when the fact of such complaint is admissible, any details of the transaction and the name of the person charged are not admissible.

2. SAME—*what actions of mother of prosecutrix are not admissible to show complaint.* While the fact that the prosecutrix made complaint to her mother would be admissible in a prosecution for rape, it is error to admit testimony of the mother that when she discovered the prosecutrix's condition she went to the police station and caused a warrant to be issued, and other statements tending to show the date of the warrant and that she named the defendant therein.

3. SAME—*defendant cannot be impeached as to immaterial matter—rape.* It is error to permit the impeachment of a defendant upon immaterial matter, but in a prosecution for rape it is not error to impeach the defendant as to his statements in regard to

his acquaintance with the prosecutrix or as to his whereabouts on the day of the commission of the offense, where the prosecutrix has positively identified the defendant as her assailant, as the question as to how long and how well she had known the defendant and the number of times she had seen him is material.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

IRWIN R. HAZEN, (ANDREW J. O'DONNELL, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROBERT C. BROWN, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

William J. Cappalla has sued out this writ of error to review the judgment of the criminal court of Cook county convicting him of rape and sentencing him to imprisonment in the penitentiary for forty years.

The crime was committed on July 29, 1925. LaVerne Miller, the victim, was a child seven years old in December, 1924. She lived with her parents at 2744 South Euclid avenue, in Berwyn, where they had lived since June 13, 1925. Cappalla had been married on April 22, 1925, and with his wife had moved on May 30, 1925, into the house at 2730 South Euclid avenue, which he, with his wife, had contracted to buy. One house and some vacant lots were between this house and the Millers'. On the morning of Saturday, August 1, 1925, Mrs. Miller discovered spots of blood on LaVerne's bed and nightgown. The child was taken to Dr. William Timmer, who examined her and found her vagina swollen and tender and that the hymen had been recently torn. There was some discharge, and a smear was

taken from the opening of the vagina and sent to the hospital for analysis by Dr. Piette, who found the germ characteristic of recent gonorrheal infection. The defendant was arrested at Sharon, Pennsylvania, and while in the custody of the police at Berwyn, between August 13 and 17, was examined by Dr. Bishop, who did not testify. Upon his admission to the county jail he was examined by Dr. Herald, clinician of the county jail, for evidence of active venereal infection, but none was discovered. He made further examinations on November 25 and January 7 but found no evidence of active infection. Dr. Charles E. M. Fischer, a specialist in diagnoses and consultations, also made an examination of a specimen from the defendant on November 19, 1925, for the purpose of determining the presence of gonorrheal infection, and testified that from his examination he was able to say that there was no presence of gonorrheal infection.

The little girl testified that she called at the Cappalla house several times. One time she played tag with Mr. and Mrs. Cappalla in the basement, another time with Mrs. Cappalla on the porch, and another time with Marion O'Donnell when Cappalla was not at home. On the afternoon of July 29 she went for Marion O'Donnell, a girl of her own age living across the street, to come out and play, but Marion could not come, so she came back across the street to the Cappalla house, where she was met at the door by Cappalla and invited in. Cappalla told her that his wife had gone out for a few moments but would return soon. She went in and the acts were done which constituted the offense charged. There is no reason to doubt that the acts to which she testified constituted the offense charged in the indictment, and if they were committed by the plaintiff in error he was properly convicted. The defense, besides the defendant's denial of the commission of the acts and testimony of his good character, was an alibi. Three witnesses testified to the good character of the defendant: Edward

McAndrews, who married a sister of the defendant's wife; Michael McAndrews, his brother; and Ethel Favrow, a sister of the defendant's wife. Cappalla testified that after July 15 he did not live at 2730 South Euclid avenue and was not at that place; that at that time he moved to 648 Belden avenue, in Chicago, to a rooming house conducted by Mrs. Jones, where he spent the night of July 28 and on the morning of July 29 went to the place of business of the William H. Wrigley Company, at the Wrigley building, on Michigan avenue, where he had an appointment with Roos and Koestner, of the Wrigley Company, at nine o'clock.

The plaintiff in error was a traveling salesman employed by the Bay Needle Company, and on June 1, after having moved into the house at No. 2730 South Euclid avenue two days before, left Chicago for a trip in Nebraska, from which he returned a month and two days later. His contract with the Bay Needle Company terminated on July 4, and on July 11 or 12 he answered an advertisement of the Wrigley Company, to which he received a reply two days later, after which he was at the Wrigley place of business almost every day, there being many applicants for the place. His appointment on July 29 was in connection with his application, and he had an interview that morning with Roos and Koestner, at which an agreement was reached to enter into a written contract on August 1. The interview lasted from 9:30 until 10:30 in the morning. At its conclusion Cappalla went to the Northwestern depot to get a satchel which he had left there when he came back from Nebraska. He left the depot about 11:30 and went on a street car to 2355 West Chicago avenue, which was the place of business of Peter Jerard, who was doing business under the name of Perfection Sheet Metal Works. He reached there about noon and shortly after went with Jerard to his house, at 2735 Rice street, a block from Jerard's place of business, for dinner. After dinner the two remained at the house until about two o'clock, then went back to the

sheet-metal works, where they remained about fifteen minutes, and then, at the suggestion of Jerard, who had only two days more to live in the place he was occupying and was looking for a new location, they went in Jerard's automobile to look at some real estate in Forest Park. They went first to 7238 West Madison street to the store of one Nickadero, where they arrived about three o'clock and remained about forty-five minutes. The three then went in the automobile to the place of business of Humboldt & Krickl, real estate dealers. They arrived there about four o'clock, met both Humboldt and Krickl, and after about five minutes Cappalla, Jerard and Nickadero went in the automobile of the real estate dealers, with Krickl, to the 6400 block on West Roosevelt road, where they remained until about 4:20. Jerard did not like the place, and the four then went in the automobile west on Roosevelt road to some place opposite a golf links, which they reached about 4:30. They were there about ten or fifteen minutes and then went back to the office of Humboldt & Krickl, at Wisconsin avenue and Roosevelt road. Cappalla, Jerard and Nickadero returned to Nickadero's home, at 7238 West Madison, which they reached about 5:10, and remained there until twenty minutes or a quarter to six o'clock. Cappalla and Jerard then went back to the city, and Cappalla left Jerard at Kedzie and Washington boulevard and went on the elevated to the post-office, which he reached about 6:30 or 6:45. He remained there about twenty-five minutes, talking to some friends in the auditing department. He then had supper at Thompson's lunch room at Adams and State streets, then went to a picture show on Madison street near Clark, and then went home to 648 Belden avenue.

Jerard testified corroborating the plaintiff in error's account of his movements during the part of the afternoon of July 29 which he spent with Jerard, in every detail, except that the plaintiff in error testified that Jerard's wife and children were present at dinner, while Jerard testified

that his wife was sick in bed and his oldest daughter served the dinner. Mrs. Jones was not a witness. Nickadero was sick at the time of the trial, as Jerard testified, so that he was not a witness. Neither Jerard's wife nor daughter was a witness. Neither Koestner nor Roos testified, nor any of the post-office employees, nor Humboldt. Krickl testified and corroborated the evidence of Jerard and the plaintiff in error so far as it referred to their being with him from three to five o'clock in the afternoon, about July 29, 1925.

There seems to be no doubt that Cappalla accompanied Jerard as both testified, and there is nothing in the evidence which tends to cast a doubt upon the date except the testimony of the little girl that on that same afternoon he was at 2730 South Euclid avenue, in Berwyn, and committed the acts testified to. That those acts were committed by someone cannot be doubted, but unless the witnesses to the actions of Cappalla on that same afternoon are mistaken as to the time they could not have been committed by the plaintiff in error. There is nothing in the evidence as to the commission of the crime to indicate that it occurred at any time other than July 29, and there is nothing in the evidence as to the doings of the plaintiff in error, in company with Jerard, to indicate that they did not occur on July 29. If both occurrences happened on the same day the plaintiff in error was not guilty. It was of the greatest importance, therefore, that no error should have been committed in getting before the jury evidence not competent to be received as to the identity of the defendant. The conviction necessarily depends on the identification of the plaintiff in error by the prosecuting witness.

Mrs. Miller having testified to her discovery of blood on her daughter's clothing and bed and to having taken her to the doctor and returned home and told her husband what the doctor told her, the following then occurred:

Q. "Where did he [her husband] go?

Mr. Maher: "Object to this, your honor.

Mr. Ayers: "Where did you go first?

The court: "Yes, that is immaterial.

Mr. Ayers: "To refresh your recollection, Mrs. Miller, where did you first go after making this discovery—to the police station?

Mr. Maher: "I object; immaterial.

The court: "She may answer; go ahead.   (Exception.)

A. "The 3d of August, I believe it was.

Mr. Ayers: "What did you do there?

A. "I had a warrant sworn out.

Mr. Maher: "I object.

The court: "I think she may state that she started prosecution.   Objection overruled."

Further answering, the witness said:  "Up to this time I had never seen the defendant, Cappalla."

She further stated that she first saw Cappalla when she took the child down to identify him.  Cappalla's attorney moved to strike the answer out, and the court asked the attorney for the People what was the purpose of the testimony.  The attorney stated, "Well, your honor, I am just laying a foundation here," and the court said, "She may state," and, "the evidence may stand."  It is contended that the court erred in admitting this testimony.

There was nothing in the record to show that LaVerne ever complained of Cappalla or mentioned his name, and if she had done so the fact would have been inadmissible.  She testified under oath and subject to cross-examination.  Her unsworn statement to her mother, if she made it, would not have been competent and it would have been error to admit it in evidence.  Mrs. Miller's visit to the police station, and her causing a warrant to be issued and the date the warrant was issued, were entirely irrelevant.  The defendant was present in court for trial.  These facts had no tendency to prove that he was guilty.  They had no bearing on his guilt one way or the other, but by the admission of this irrelevant testimony the fact that the mother

promptly after discovering her daughter's condition charged the defendant with the crime and swore out the warrant for his arrest was brought forcibly to the jury's attention as competent evidence for them to consider in determining the defendant's guilt or innocence, and the jury would no doubt infer that LaVerne had told her mother that Cappalla was her assailant, and to that extent her testimony on the witness stand would be corroborated by her unsworn statement to her mother to be inferred from her mother's action. If LaVerne had told her mother on Saturday morning, August 1, what had occurred on Wednesday, July 29, and that it was the defendant who had done the acts complained of, neither the fact that she had told of the offense, the details which she related, nor the name of the offender, if she had named him, would have been competent evidence to give to the jury. While in a prosecution for rape evidence of a complaint made by the prosecuting witness to a third person is admissible in corroboration of her testimony as to the commission of the crime on the ground that it is the natural and spontaneous expression of outraged feeling, yet if the complaint is made in response to questions it is not admissible, and when the fact of such complaint is admissible, any details of the transaction and the name of the person charged are not admissible. (*Stevens* v. *People,* 158 Ill. 111; *Cunningham* v. *People,* 210 id. 410; *People* v. *Hamilton,* 268 id. 390; *People* v. *Moore,* 276 id. 392.) It would have been no more prejudicial to the defendant to have permitted the People to show that LaVerne did complain to her mother and did name the defendant as her assailant than to admit the evidence of her mother's action, from which the jury would infer the same thing.

Cappalla testified that on August 1 he signed a contract with the Wrigley Company and went to Sharon, Pennsylvania, in its employment. He testified on cross-examination that he was arrested at a hotel in Sharon and was not then informed what the charge against him was; that he did not

refuse to come back when he was first arrested; that his boss advised him that it would only indicate guilt if he refused extradition; that he said he would go back, and he did, signing a waiver of extradition, and that it was seven days after he heard the charge before he boarded the train. In rebuttal, Anthony Gentile, a policeman who went to Sharon to bring Cappalla back to Chicago, testified, over objection, that when he got to Sharon he found Cappalla under arrest and told him he was there to bring him back to Chicago. Cappalla wanted to know what it was all about,—he had done nothing,—and Gentile told him he was charged with rape of a little girl in Berwyn; that Gentile was there with extradition papers, and Cappalla said that he was willing to come back at once. Gentile was then asked, "Was there anything said by the defendant with reference to changing his mind?" and was permitted to answer, over objection, that he said he was going to fight extradition, and then he said he was willing to sign a waiver and come back after he got there; that Gentile returned with the defendant to Chicago and paid for the transportation. This evidence should have been offered in chief. It suggested that the plaintiff in error at least contemplated avoiding the consequences of his act by resisting extradition and it had no tendency to rebut anything to which he had testified. The order in which evidence shall be received is, however, to some extent discretionary with the court, and we cannot say that the court abused its discretion in admitting the evidence in rebuttal.

On his cross-examination Cappalla testified that he had a talk with officer Soldat but did not tell him that he had gonorrhea for five years prior to that time or that he had had gonorrhea. In rebuttal Soldat was permitted to testify, over objection, that Cappalla said to Soldat, "As far as my being diseased, I had clap five or six years ago; but that has dried up." The evidence was immaterial. It does not appear that his condition in the respect mentioned five

or six years before had anything to do with the case, and it was error to permit the impeachment of the defendant upon immaterial matter. *Dalton* v. *People,* 224 Ill. 333; *People* v. *Israel,* 269 id. 284.

Cappalla testified that he had seen LaVerne only twice before his arrest, the first time being on Decoration day, May 30, and the second on July 4. He later modified his testimony as to May 30, that he did not know whether the girl he then saw was LaVerne or not. On rebuttal the People were permitted to show that LaVerne was not in Berwyn on Decoration day, by showing that her family did not move to that place until June 13, and to show that she went with her parents to Delavan, Wisconsin, on July 3 and did not return to Berwyn until July 6 or 7. It is objected that this evidence was also impeachment of Cappalla on an immaterial point, but the objection cannot be sustained. LaVerne identified Cappalla positively as her assailant, and the question as to how long and how well she had known him and the number of times she had seen him was material on that point. The same thing may be said of the objection to the contradiction of Cappalla's testimony that he was not in Berwyn after July 15 by Mrs. Kennedy, a neighbor, who testified that on July 28 he came to her fence and borrowed a ladder from her, which he used to get into his house through the window, telling her that his wife thought he was out of town and he left his keys on the table. She also testified that he called her by telephone on July 30, asking her if anything was doing around his house, saying he was coming home. Cappalla gave a different version of the testimony, saying that the borrowing of the ladder was on July 15 and the telephone call on July 17.

Objection has been made to the refusal of several instructions which the plaintiff in error asked to be given to the jury, but so far as they stated principles of law which

should have been given they were substantially given in other instructions.

For the errors in the admission of evidence the judgment is reversed and the cause remanded.

*Reversed and remanded.*