(No. 26678.—
The People of the State of Illinois, Defendant in Error, *vs.* Harry Dallas Martin, Plaintiff in Error.

*Opinion filed September 25, 1942.*

ARTHUR G. HARRIS, (OTTO W. BERG, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and MAX A. WESTON, State's Attorney, (JOHN T. BEYNON, of counsel,) for the People.

Mr. JUSTICE SMITH delivered the opinion of the court:

This is a writ of error to review a judgment of conviction entered by the circuit court of Winnebago county. Plaintiff in error was charged with the crime of taking indecent liberties with a child. The indictment contained two counts. The only difference between the counts is

that the first count alleged that the prosecuting witness was a female child under the age of fifteen years and over the age of six years, while the second count alleged that she was under the age of fifteen years.

When plaintiff in error was arraigned he entered a motion to quash the indictment. This motion was overruled. He then entered a plea of not guilty. The case was tried by a jury. A verdict was returned finding plaintiff in error guilty on both counts of the indictment. The jury signed and returned with their verdict a recommendation that the defendant be committed to a State institution for the "criminally insane." A motion for a new trial was overruled and judgment entered on the verdict. Plaintiff in error was sentenced to the State penitentiary at Joliet for a term of not less than one, nor more than twenty years. The court recommended a minimum term of four, and a maximum term of eight, years.

In view of the fact that the chief contention of plaintiff in error is that the prosecution failed to prove his guilt beyond a reasonable doubt, it is necessary to make a somewhat extended analysis of the evidence introduced to prove the *corpus delicti.*

The first witness for the State was the prosecuting witness. At the time of the trial this witness was six years of age. An objection was made as to her competency as a witness, because of her age. She was examined by the court and testified that she knew that she should tell the truth, because if she did not tell the truth she would be "spanked." It appears from the evidence that she was not yet of school age, and while she stated that she had attended "Church School" she also said that she had only been to Sunday School once. The trial judge allowed her to testify, and the question of her competency is argued here. This question will be discussed later in the opinion.

The witness testified that on the day in question she went down to the Fair Grounds Park; that she saw a man

standing by the sand pile and that he offered her a penny if she would get into his car; that she got into his car and he gave her a penny and then he tickled her underneath her dress. She then testified that she took the penny and bought some candy cigarettes. She stated that the car was a green car with white tires and that she saw in the car, a clock, a fan, a red and blue blanket and some shiny buttons.

On cross-examination she testified that when she was taken to the police station (about a week after the alleged crime) she saw the defendant and was asked if he was the man who molested her; that she told the police that he was not, but she was wrong when she said that; that the reason she changed her mind was that she had talked it over with her mother and with the assistant State's Attorney. She testified positively concerning the identification of the car and was particularly positive that the car had a clock in it. Upon going over the testimony concerning her identification of plaintiff in error at the police station, a second time, she stated that she was asked, "Is that the man?;" that she answered "No;" that thereafter the policeman and her mother and the State's Attorney told her to say that plaintiff in error was the man who molested her; that although she did not think he was the man until the policeman told her to say he was, she was now positive of her identification.

It also developed that she was holding several pennies in her hand while she was testifying, which her mother had given her just before she went on the witness stand; that her mother had told her she would buy her a doll if she would be good. On re-cross-examination, she testified that she was positive that the alleged crime took place in the afternoon. Her obvious confusion is shown by the fact that while she was sure it was afternoon, and positively stated it was after two o'clock, she later said it was late in the afternoon, but that the sun was "way up high in the sky."

The prosecution then placed the mother of the prosecuting witness on the stand and she testified that her daughter went to Fair Grounds Park on June 23 about ten o'clock in the morning and came back about noon; when her daughter came back, she had some candy cigarettes. The next day she went down to Fair Grounds Park and saw the defendant lying on the grass. Apparently he then got up and entered his car, which was a green car with white tires; that she went over to the car and asked him if he was in the park the day before. He told her he was not. She testified that she then told him that his car was identified as the one that was down there the day before, but he denied that his car had been in the park on that day. She then asked him for his name and address, which he gave her, and she told him that a little girl had been assaulted there; that his car answered the description of the car that the man guilty of the assault was in; that he thereupon again denied that he was in the park the day before, and stated that he had been out looking for work all morning on that day. She further testified that she saw an Indian blanket of mixed colors in the car; that she also noticed the shiny buttons. That afternoon she went to the defendant's home with a police officer and looked over his car, which was in the front yard. She did not see the defendant again until a week later at the police station.

Hal Campbell, a police officer of the city of Rockford testified that on June 24, a lady with a little girl came to the station and he accompanied them to the defendant's residence, where they inspected the defendant's car. He said that he talked with Mrs. Martin, but never saw the defendant at that time, and has never been back to the house since that day. About a week later the defendant appeared at the police station and Campbell talked to him in the presence of officer Mark Parker. He stated that defendant told him he had taken his wife downtown on Monday to shop and then he took the car to Anderson's

garage for some repair work. When defendant found that Anderson could not repair it he drove to the Fair Grounds Park. Campbell then testified that defendant confessed to him the crime charged. It was during this interview that defendant signed the confession which was subsequently introduced in evidence as People's Exhibit No. 1. On cross-examination officer Campbell denied that he had held out any promise to defendant that if he did confess to this crime he would be sent to a State hospital where he could be cured. He did admit that defendant said to him, "Now, Campbell, you are not double crossing me in this," and "You are not getting me to sign something that will get me into trouble." He stated that defendant did not ask these questions until after he had made his confession and had read over the statement and signed it. He testified further that when defendant first talked to him he denied having been to Fair Grounds Park on June 23; that it was only after an hour or so of questioning that he finally admitted the crime. He stated that defendant was extremely nervous and shaky throughout the interview, and that after the statement was read to him, defendant said in effect, "My God, you are fixing to send me to jail;" that he told defendant that two things could possibly happen to him, either he would be declared insane and sent to a hospital where he would be cured or he would go to the State penitentiary. He denied that he ever promised him that he would see that he was sent to the State hospital.

George Morris and Harry Bushaw testified that they went out to defendant's home on June 25 and again on June 26, but he was not at home.

Ralph Johnson, a detective sergeant, testified that he went out to Martin's home on June 25 but could not find him. On cross-examination he testified that when Martin was at the police station a little girl was brought in and asked whether or not this was the man who played with her and that she replied that he was not the man; that

after her mother had taken her out in the hall and talked to her she then came back in and said that he was the man. He said the little girl was highly nervous and that when she went into the room, her mother "kind of pushed her" and that she just glanced up once or twice and said, "that's the man."

Dr. Egbert W. Fell, a physician, testified that he examined defendant on June 30 in the county jail to determine whether or not he was suffering from a mental disease. He stated that defendant was suffering from asthma and apparently was deeply distressed, but that he thought he was sane; that defendant first told him that the policemen had said that if he would sign a paper which they wrote out he would be sent to a hospital where his illness would be taken care of and he could come home in a short time a well man. The doctor further testified that when he asked him if he did what he was charged with, the defendant denied it, but subsequently did say that he did commit the offense. Later, on July 10, the doctor examined Martin again and at that time he stated that he did not commit the crime and the reason that he said he did was because the officers promised him that he would be sent to a hospital if he confessed; that he told him then that he was with his wife at the time the act was supposed to have occurred. He stated that he was very vague about the crime and did not go into it in any great detail.

Plaintiff in error testified in his own behalf that on the morning of June 23, he and his wife took their son to work at the Free Sewing Machine Co., about seven o'clock; they next went to the Goodwillie-Green Box Co., where he inquired about a job and talked to the foreman until about nine o'clock; he then went downtown and talked to a cab driver for a while, and proceeded to the Anderson garage on South Second street; his wife was with him up until this time. While he went into the garage to see whether or not some parts had come in for repair of the grill on his car, his wife went across to the Five and Ten Cent

store; she was gone only for a few minutes; she then returned to the garage and waited in the car until about noon. At that time they discovered that the car could not be repaired. From the garage they went directly home and ate lunch and then he went out in the back yard and worked for about a half hour. He then got sick and went to bed until about 4:30 and then got up and went down to the Sewing Machine Co. to get his son. They returned home, had supper, and went to bed about eight o'clock. On the following day he took his son to work by himself, then went back to Goodwillie-Green Box Co., leaving there about nine o'clock. From there he went to Roper's looking for work and then to the garage, but the parts had not yet arrived. From the garage he went down to the Fair Grounds Park to watch the life savers dive, and parked on the west side of the swimming pool. After watching them for a few minutes he got back in his car; that prosecutrix's mother than came up and asked him if he had been in Fair Grounds Park on the previous day. He denied that he had and she asked him for his name and address, which he gave her. He then asked her what she wanted it for and she told him a little girl had been attacked in the park and she had been told that the man was driving a car like his. He said to her, "You don't accuse me of that," and she said well, if he did not do it he would not be harmed. He then returned home and that afternoon got nervous thinking about what prosecutrix's mother had said and finally walked over to Emmett Orr's to see about work. The matter preyed on his mind and he decided to go to Freeport, and hitchhiked there, arriving about 2:30. While he was walking around on the street he saw the Peoria bus and decided to go to Peoria to see his sick sister. He got on the bus and went to Peoria. That night he sat up all night in the City Park talking to the night watchman because he did not know how to locate his sister. The next morning he found his sister and stayed there until Sunday morning when his wife and son came after him. They all

returned to Rockford and he went directly to the police station and inquired if there were any charges against him. No one at the desk seemed to know about it. They finally locked him up and the next morning he was turned over to a man named Johnson. He denied to Johnson that he had done anything wrong, and Johnson turned him over to officers Campbell and Parker with the statement that he was the man who had molested the girl in Fair Grounds Park. He also denied to Campbell and Parker that he had done anything wrong.

Plaintiff in error further testified that Campbell told him they were interested in seeing him get well, because Dave Jarrett had recommended him and that they were going to doctor him. He said Campbell told him that if he would sign some papers stating that he committed the crime, they would send him to Moline where expert doctors would take care of him and cure him. He stated that he told them that he did not want to confess to any crime like that, but they told him that they were his friends and that only a few fellows in the office would know about it and he could be sent to the State hospital and be cured without any publicity or trouble. He further stated that the only part of the paper which they read to him was the part stating that no force was used in getting him to sign the paper; that it was written by the officers without any dictation from him. He said that he was extremely nervous and could scarcely see the paper, but that officer Parker loaned him his glasses to enable him to see and sign the paper. It appears from his testimony and the later testimony of his wife, that the defendant could not read and had never reached the point beyond the first grade in school.

Plaintiff in error testified that the story contained in the alleged confession was one which officer Campbell made up for him and that he was persuaded to sign the confession only because Campbell told him it was necessary that they have something like that in order to get him into the hos-

pital for treatment; that Campbell told him to be sure and tell the same story to the State's Attorney and to Dr. Fell; that this was the only reason he did so.

On cross-examination, he stated that about 35 years previous he had been in an institution at Bartonville, Illinois, where he was treated for a mental disorder which resulted from sunstroke.

Josephine Martin, wife of plaintiff in error, testified in his behalf. She corroborated him as to his alibi; that she was with him at all times except for the few minutes that she was in the Ten Cent store, on June 23. Eugene Martin, his son, testified to being taken to work that morning; that the car was owned by him, although his father drove it. He testified positively that there never was a clock in the car, although he stated there was an Indian blanket folded over the front seat. He testified to going down to Peoria with his mother to get plaintiff in error and bring him back to Rockford. He also testified that Campbell told him the little girl had denied that his father was the man who had committed the crime and that Campbell had further said that they had been propositioning his father to get him to sign a paper so that he could be sent to a State institution for treatment; that Campbell described the paper his father signed, to this witness, as a "transfer."

This is substantially all of the testimony in the record, except some character witnesses introduced by both sides. The character witnesses introduced by plaintiff in error were people for whom he had worked from time to time and several of his neighbors. The character witnesses examined by the State were neighbors, several of whom admitted they had personal grievances against plaintiff in error. On the whole, the character witnesses on both sides are unsatisfactory. The prosecution called as a witness the superintendent of the Bureau of Identification of the police department of the city of Peoria. He identified a card from the files of the Peoria police department, purporting

to show that one Harry Martin was arrested on December 4, 1913, on a charge of indecent exposure and had served six months in the house of correction. Plaintiff in error, while on the witness stand, had denied that he had ever been arrested on such a charge or had served a term in the house of correction. This was introduced for the purpose of impeachment. In rebuttal, plaintiff in error testified that he was in an insane hospital around Peoria for five or six months, but that he had no memory of having any fingerprints taken or being in the house of correction. He testified he was in the hospital about December, 1913, and was unconscious for about three months as a result of a sunstroke. He stated that unless he was arrested during that period of time, of which he had no recollection, he had never been arrested.

It will be seen from the above resume of the evidence that the only proof of the *corpus delicti* is in the testimony of the prosecuting witness and in the alleged confession, which plaintiff in error repudiated on the trial. The only identification of plaintiff in error as the man who committed the alleged crime is admittedly the identification by the six-year-old girl. Her testimony is of doubtful value. She was able to identify him only after being told to do so by her mother. We entertain serious doubts, because of her extreme youth and the circumstances shown in connection with her identification of plaintiff in error and in connection with her testimony on the trial, whether her testimony should have been admitted at all. Inasmuch as the mother was not present at the time the alleged offense was committed and had no way of identifying the guilty party, except by the statement made to her by her daughter that he was driving a green car with white tires, the testimony of the mother is not corroborative. In this state of the record we cannot say that the *corpus delicti* was proven by competent evidence, beyond a reasonable doubt.

It should also be noted that the defendant's story as to how he was induced to sign the confession is corroborated

in several respects. In the first place, he told substantially the same story to the physician who examined him prior to the date of the trial. The testimony of this physician does not show whether he even suspected that plaintiff in error was falsifying in regard to the promises held out to him by officers Campbell and Parker. The most significant fact, however, is officer Campbell's admission that plaintiff in error stated to him, "You are not double crossing me," and "My God, you are fixing to send me to jail." There would be absolutely no reason for him to make either of these statements unless the officers had represented to him that they were trying to assist him when they procured the alleged confession.

There is nothing in the record except this repudiated confession which materially corroborates the story of the prosecuting witness. We are not satisfied that the guilt of plaintiff in error has been proved beyond a reasonable doubt. The evidence does not create in our minds the abiding conviction of the guilt of plaintiff in error, which is necessary in order for us to sustain the conviction. (*People* v. *Serrielle*, 354 Ill. 182; *People* v. *Nemes*, 347 id. 268; *People* v. *Fitzgibbons*, 343 id. 69.) The State urges that the fact that plaintiff in error fled from the scene of the crime and went to Peoria is a proof of his guilty conscience and tends to corroborate the testimony of the prosecuting witness. With this interpretation we cannot agree. Apparently defendant was highly nervous and mentally unstable. This fact is reflected in the recommendation of the jury, who after observing his actions in the court room and on the witness stand, even without any direct evidence on the subject believed that he should be committed to an institution for the insane. This suggestion originated with the jury alone. Apparently the jury was unwilling to return a verdict of guilty without such recommendation. The fact that after he left the scene of the crime, he was easily persuaded to return and surrender himself to the police authorities in Rockford, also overcomes the presumption of guilt which

the State contends arose because of his alleged flight. It is not reasonable for us to believe that a man who had fled for the purpose of evading punishment under the lash of a guilty conscience would return and report to the police officers when no charges had been placed against him up to that time, under the circumstances shown in this record.

The other errors urged by the plaintiff in error in this court are the admission of the confession in evidence, the admission of the testimony of the prosecuting witness, the admission of the card from the files of the Peoria police department and the alleged failure of the prosecution to prove the venue. What we have said renders any discussion of those questions wholly unnecessary.

The crime here alleged is one similar, except possibly in degree, to the crime of rape. We have repeatedly held in rape cases that where a conviction depends upon the testimony of the prosecuting witness, and the defendant denies the charge, there must be substantial corroboration of the prosecuting witness by some other evidence, fact or circumstance in the case. *People* v. *Kazmierczyk,* 357 Ill. 592; *People* v. *Abbate,* 349 id. 147; *People* v. *Glasser,* 335 id. 263.

A similar rule should be applied in a case of this character. In view of the extremely unsatisfactory nature of the testimony of the prosecuting witness, a little girl, whose fear of her mother is her only reason for telling the truth, and who identified the defendant only at her mother's insistence, this conviction must be reversed. The record is such that it does not appear that additional or more satisfactory evidence might be produced by the prosecution on another trial. No good purpose would be served by remanding the cause for another trial. The judgment is therefore reversed and the cause will not be remanded.

*Judgment reversed.*