**People of the State of Illinois, Plaintiff-Appellee, v. Ellsworth Brown, Defendant-Appellant.**

**Gen. No. 51,820.**

First District, Fourth Division.

July 10, 1968.

Rehearing denied and supplemental opinion October 9, 1968.

Chester A. Lizak, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Ronald Sandler, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

CRIME CHARGED
Rape.

JUDGMENT
There was a preliminary competency hearing at which a jury found defendant to be sane. After a bench trial, defendant was found guilty of rape and sentenced to a term of 15 to 30 years.

CONTENTIONS ON APPEAL
(1) The evidence was insufficient to establish guilt.
(2) At the pretrial hearing a verdict of incompetency should have been directed by the court.
(3) The competency hearing was not fair.
(4) The sentence was excessive.

EVIDENCE AT THE TRIAL
*Billie Jean Richardson,* for the State.
She was married on June 10, 1960, and at the time of her testimony in December, 1965, had three children aged 5, 4 and 1, the youngest born by Caesarian section

on December 8, 1964. The last time she had lived with her husband was in 1962, having lived since then with her mother and sister.[1] She "really wasn't divorced," although she remembered testifying before the grand jury that she was divorced.

She had not known defendant before January 9, 1965,[2] when, at 2:30 a. m., she was walking alone down a well-lighted street. Three men (one of whom she identified as defendant) came up and started beating her. One man threw something at her face which exploded and got in her eyes. They dragged her into a gangway and beat her on the face and head. All three had knives. Further,

> I told Ellsworth Brown that I just had a Caesarian operation. The other two men then left. Brown walked me down the street to a courtway building. I did not try to escape, because he had a knife. . . . When he got me down to this gangway, he snatched the bandages off of my stomach.[3] I was fully dressed; coat, skirt, blouse and sweater. I also was wearing a slip, bra and panties. Before he raped me, he showed me a white business card. I saw the letters "G, L, U" and the word "Clinic" on it. . . . In the courtway building, he had a knife against my

---

[1] She testified that after her husband left in 1962 she had not "lived with anyone else. . . . It doesn't necessarily mean that I lived with anyone to have a baby. I have known other men." She testified further that on the day in question she did not have intercourse with any man other than the defendant.

[2] Later, she corrected herself as to the date: January 6, not January 9.

[3] On cross-examination she changed her testimony to the effect that the bandages (from her Caesarian operation) were snatched from her by defendant in the presence of the other two men before defendant walked her to the courtway building. She denied stating to the police that the other two men had left before the bandages were torn off. She then read her signed statement to that effect, but she stood by her cross-examination testimony that all three men were present at the time.

neck and he had me against the wall in a dark space. A cabdriver came back and asked if anyone called a cab. We didn't say anything.

The cabdriver hollered up the stairway, but nobody answered so he went back. All the time the cabdriver was present, defendant was holding her with one hand and was holding a knife to her neck with the other. He also had the knife against her neck when he took out his wallet. The business card to which she referred was sticking out of the wallet.

Continuing,

> I guess he (the cabdriver)—from the way it seemed to me, we were just standing there talking, I guess. [Defendant] told me to turn around and face the wall. He kind of tore my slip and skirt. He didn't unzip my clothes or anything, all he did was pull them up from behind and told me to bend over slightly. . . . He had intercourse with me, while my panties were on. . . . Mr. Brown had intercourse with me by pulling the panties aside.

After the other two men had left, she was with defendant about 25 minutes. After he raped her she stayed there a few minutes, then went home and told her mother and sister of the incident. They reported her story to the police. Later that evening, she described to the police what had happened and was taken to Mount Sinai Hospital where a Dr. Janabi examined her, took a smear test, and treated her eyes.[4] She didn't know what happened to the underclothing she was wearing at the time of the incident. The police didn't take them. The sweater and skirt were at her home. She next saw defendant on January 15 when she identified him in a "show-up" at the police station. She also identified the card defendant

---

[4] The doctor was out of the country at the time of trial.

had shown her on January 6, and it was introduced into evidence.

She was positive that she had never stated to the police that all three men had raped her. "If the officer were to testify to that, he would be lying."

*Patrick King,* for the State.

He was the police officer who talked to Billie Jean Richardson on January 6, 1965, at about 10:00 a. m. She appeared tired and sleepy.

On January 15, 1965, he arrested defendant. Defendant carried a wallet and card similar to the ones Billie Jean had described, and she identified defendant at a police lineup. She also made a statement which he typed as she dictated.

At the police station he asked defendant what he had to say about the case. Defendant stated that on his way home he saw two men attacking a woman; that he crossed the street to help the woman as the two men ran off. Billie Jean was the woman, and she accepted defendant's offer to accompany her from the location of the attack. Defendant walked her to a courtway building where he showed her a "Dr. Gluckman's Clinic" card. Defendant told her he worked at the clinic and that she could get in touch with him there. At that time a cabdriver came into the courtway inquiring if anyone had called for a cab. Defendant answered, "no," and walked out of the courtway with the cabdriver, "halfway down the street." Defendant denied having raped Billie Jean.

*Sharon Loeb,* for the State.

On January 6, 1965, she was employed by Mount Sinai Hospital as a registered nurse. She was present when Dr. Janabi administered the smear test to Billie Jean.

*John Cioe,* for the defense.

██ He was a police detective. On January 6, 1965, he took a statement from Billie Jean Richardson in the Mount Sinai Hospital emergency room. Since he had no

independent recollection of the conversation, the defense introduced into evidence a copy of the report he had filed concerning the interview. The report read in part: "She was forced into the gangway where all three had sexual intercourse with her, by force and against her will. . . ." [5]

*Ellsworth Brown,* defendant.

He had been convicted of robbery in Virginia in 1961. He testified to the following:

> On the morning of January 6, 1965, while on my way home, I saw two men attacking Miss Billie Jean Richardson. . . . I crossed the street but I didn't see Miss Billie J. Richardson. I am afraid of dogs and I thought she was a dog crawling out of the gangway. But at the time I approached her there was a cabdriver coming, he was looking for someone. So he and I walked her down the street and that is when she told me, you know, and him, in his presence that the other two guys tried to do something to her, and she told us about some sort of operation. I, in turn gave her my address and showed her a card of the place where I was working and told her that's where she can find me up to 12:00 o'clock in the

---

[5] While this report contained other matters, the only portion of the report abstracted is quoted verbatim. Supreme Court Rule 38 provides that the abstract will be taken as sufficient unless the opposing party files an additional abstract. (New Supreme Court Rule 342 contains the same provision.) The State did not file an additional abstract. We are, therefore, not required to consider other matters referred to by the State in its brief by citation to the record. Little v. Chicago Nat. Life Ins. Co., 273 Ill App 148. However, the State's case would not be helped by so doing, because the report was introduced for the purpose of impeaching Billie Jean's testimony by a prior inconsistent statement and does not constitute evidence of any positive assertions of fact which it contains. Smith v. Pelz, 384 Ill 446, 451, 51 NE2d 534; Nelson v. Northwestern El. R. Co., 170 Ill App 119.

287

afternoon. . . . The Yellow cabdriver was present when I walked her home. . . . She didn't say anything about rape until we were standing in front of her house.

Defendant testified that he did not report the assault to the police. Also, he repeatedly denied raping Billie Jean.

OPINION

 Because of the nature of the crime, reviewing courts are charged with an extraordinarily high standard of care in examining the evidence in a rape case. People v. Perez, 412 Ill 425, 107 NE2d 749; People v. Kazmierczyk, 357 Ill 592, 192 NE 657. When the charge is denied and the conviction depends upon the testimony of the complaining witness, it must be corroborated by evidence of other facts and circumstances unless her testimony is clear and convincing. People v. White, 26 Ill2d 199, 186 NE2d 351; People v. Mack, 25 Ill2d 416, 185 NE2d 154; People v. Reaves, 24 Ill2d 380, 183 NE 2d 169.[6] In the case on appeal, Billie Jean's testimony is the only evidence offered to prove certain essential elements of the offense. While this situation is by no means unusual, application of the principles set forth above requires that the evidence be subjected to close scrutiny. People v. Fitzgibbons, 343 Ill 69, 174 NE 848.

In so doing, we conclude that her testimony was not clear and convincing. She was impeached, in part, at least, by her own inconsistent statements. At the trial she changed her account of when her bandages were torn off by defendant. When she did decide on the correct sequence of events, this version was at variance with

---

[6] The State cites People v. Webb, 76 Ill App2d 333, 222 NE2d 190, as a case affirming a conviction for rape on the testimony of the victim without corroboration. We note, however, that the court there found the testimony of the complaining witness to have been "clear and convincing."

the signed statement she had given the police shortly after the incident. Then, she testified positively that defendant was the only person who had intercourse with her on the morning of the attack by the three men. This testimony was impeached by her statement taken at the hospital in which she asserted that all three men had had sexual intercourse with her. Even in the traumatic setting of a rape, it defies explanation as to how a woman, fully conscious throughout the episode, would be mistaken under oath or would forget whether she had been forcibly subjected to intercourse by one man or by three men. It also cannot be explained how she would not have been sufficiently impressed by the incident to have remembered at what point in the basic sequence of these terrible events the Caesarian surgical bandages had been ripped from her body, or how this could have been accomplished, she being fully clothed at the time. Further, the marked inconsistency between Billie Jean's testimonial descriptions of her marital status at the trial and before the grand jury has a strong tendency to impeach her credibility under oath. To be sure, these variances are not material as bearing directly on proof of the elements of the crime charged, but they are not minor or unimportant on the question of her credibility when viewed in the light of the evidence as a whole. See People v. Webb, supra.

■ ■ In a prosecution for rape, "where evidence is offered substantially impeaching the truth of her statements and the defendant denies the crime, her [the prosecutrix'] evidence should be corroborated." People v. Fitzgibbons, supra, at 72. Also, when the complaining witness' testimony in itself lacks verisimilitude, there must be corroboration by other testimony, facts or circumstances. People v. Qualls, 21 Ill2d 252, 171 NE2d 612. Does it not overtax one's credulity that, while holding a knife against the neck of his intended victim and maneuvering her for the purpose of committing rape, defendant

should manage to extricate the wallet from his pocket and force her to look at his calling card? Is it not somewhat incredible that, while defendant was holding Billie Jean with one hand and holding the knife to her neck with the other hand, they carried on a conversation with the cabdriver, the three of them "just standing there talking?" Does not Billie Jean's story reach the realm of unreality when one visualizes the position of the parties during the moments of actual intercourse—she, facing the wall and bending over "slightly"; he, standing behind her, holding her with one hand, holding a knife to her neck with another hand, holding her panties to one side with another hand, guiding himself with another hand (without which assistance accomplishment of the act may well have been a physical impossibility in this posture of the case)? Surely, it is not an undue burden upon the prosecution to require that such testimony be corroborated to some extent, at least, if it is to support a penitentiary sentence.

Are there, then, any facts or circumstances in the record which do furnish sufficient corroboration? The testimony of the nurse at the hospital on the morning in question is not corroborative of the allegation of intercourse, for the results of the smear test which she referred to were never put in evidence. The fact that when defendant was apprehended he had in his possession the calling card which the complaining witness had described, does not really support her story because of the unlikelihood of his having shown it to her in the situation as she pictured it. Furthermore, defendant's possession of the card was equally consistent with his own explanation, and, in any event, this evidence would primarily serve only to bolster her identification of defendant, which was never controverted.

■■ If the testimony of the complaining witness is corroborated at all, therefore, such corroboration must

be found in her having made immediate complaint. In rape cases, the fact of the victim's complaint of the offense without inconsistent or unexplained delay is admissible to strengthen her testimony as to commission of the crime. Stevens v. People, 158 Ill 111, 41 NE 856; People v. Damen, 28 Ill2d 464, 193 NE2d 25. For this to be truly corroborative, however, it must be proved by the testimony of third persons that the prosecutrix complained to them. People v. DeFrates, 395 Ill 439, 70 NE 2d 591. By definition, no witness can corroborate his own story. In People v. Rossililli, 24 Ill2d 341, 181 NE2d 114, the court found that the testimony of the complaining witness was "entirely uncorroborated"; yet, she had testified that as soon as she was freed by the alleged rapists, she had gone directly to the police to make complaint. Further, for the complaint to carry any weight, it must be a natural and spontaneous expression of outraged feelings. See People v. Cappalla, 324 Ill 11, 154 NE 451; Cunningham v. People, 210 Ill 410, 71 NE 389.

In the case on appeal, neither the mother nor the sister, nor anyone other than Billie Jean, testified to the fact of prosecutrix' complaint. Even Billie Jean's testimony did not establish that her complaint was a "natural and spontaneous expression of outraged feeling." In view of her testimony that she stayed at the scene for a few minutes and then walked home, there is some question as to whether she had not thus taken the time to mull over her story.

DECISION

 We have reviewed the evidence according to the dictates of People v. Dougard, 16 Ill2d 603, 607, 158 NE 2d 596, and have come to the conclusion that the State's proof was "of such an unsatisfactory character as to raise a reasonable doubt" of defendant's guilt. People v. Rossililli, supra, at 345–347. The judgment of convic-

tion is therefore reversed. Because of this determination, we will not discuss the other errors assigned.

Reversed.

McCORMICK, P. J. and DRUCKER, J., concur.

SUPPLEMENTAL OPINION ON PETITION FOR REHEARING

MR. JUSTICE ENGLISH delivered the opinion of the court.

The State has petitioned for rehearing, not contending that we have overlooked or misapprehended any points in deciding to reverse the conviction, but arguing only that the appropriate appellate remedy in this case would be to remand for a new trial rather than to reverse outright. Thus, the issue now presented is whether the State should be allowed a second chance to meet its burden of proof in a case in which (1) it had failed to adduce sufficient evidence to support a conviction at the trial, and (2) no material evidence offered by the State had been erroneously excluded or stricken. We are convinced that the State is not entitled to this kind of opportunity to rehabilitate its case at the expense of defendant's right to acquittal on the evidence which the State did see fit to present.

A necessary corollary to our conclusion (that the evidence was insufficient to support defendant's conviction) is that a judgment of acquittal should have been entered by the trial court. Had such a judgment been entered after a trial on the merits, defendant would have been discharged. In that circumstance, we cannot conceive of the possibility that the State would consider it even arguable that defendant should be retried in the hope (or even expectation) that gaps in the State's

case might be filled by additional evidence.[1] And, of course, the State could not appeal in that situation. Illinois Const, art 6, § 7. Nor would it be open to the State to re-indict the defendant for the same offense. United States Const, Fifth Amendment.

Defendant in this case exercised his constitutional right to appeal his conviction, and, in so doing, he did not ask for a new trial. Having succeeded in establishing in this court that the trial judge should have acquitted him for failure of the State to prove its case, the defendant should be in no worse position than he would have been if he had been properly acquitted at the time of trial.[2] We believe that it would be within our authority to reverse and remand with direction to enter a judgment of acquittal, but the legal effect would be the same as that accomplished by a simple reversal here.

 In our view, it is irrelevant that the State's Attorney thinks that other witnesses might be available for a second trial. Assuming otherwise, however, in the absence of a conclusion by a reviewing court that the State had been erroneously prevented by the trial judge from introducing material evidence at the trial, we are aware of no satisfactory method by which a court on appeal could gain any certain knowledge that the State's proof would be adequate in a retrial. Or, looking at the

---

[1] The Illinois Code of Criminal Procedure sets forth the procedure for a motion for new trial on behalf of a defendant after a verdict or finding of guilty, but makes no provision for a motion for new trial on behalf of the State after an acquittal. Ill Rev Stats (1965), c 38, § 116–1.

[2] We can see no essential difference—except one of unfairness —between a defendant who is acquitted at trial and one who has to appeal to obtain reversal of a conviction on the ground of insufficient evidence. Surely, it would compound the unfairness to require that the latter also submit to a retrial.

question from its opposite side, it might more logically be presumed that in every reversal for failure of necessary proof, the State would, if given another chance, make out a better case, since otherwise the prosecution should never have been undertaken in the first place, and remandment in every case of reversal should therefore be required. In our judgment, however, this whole second-chance doctrine would be unavailing to the State in any event because such a retrial would be controlled and prohibited by the direction in the Fifth Amendment that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." [3]

We have considered the cases which the State has cited as supporting its position. Sullivan v. People, 108

[3] In his petition for rehearing, the State's Attorney seeks to support his argument by noting that, in answer to a Bill of Particulars, the State listed 18 possible witnesses, whereas at the trial only 7 took the stand. We do not consider that an adequate representation has been made as to the additional evidence which would, with certainty, be presented at a new trial, even if this were clearly the only criterion for remandment. This case thus presents a good example of what we have in mind: at a second trial the State might use 10 or 12 witnesses and, if reversed again, maybe 15 would be presented at a third trial, and so on. Only one witness is claimed to have been unavailable (absent from the city) at the time of trial. The record does not disclose, however, that the State made any attempt to obtain a continuance on that account, pursuant to the Code of Criminal Procedure. Ill Rev Stats (1965), c 38, § 114–4(c)(2).

Having remanded for a new trial, it would appear to be impractical for a reviewing court to attempt control of such trial to insure that evidence more satisfactory to the prosecution would be introduced. The new trial could not very well be granted on that condition (even if we were to consider this a desirable procedure, which we do not), and, if it were, the standard would be impossible of practical application. Suppose, further, that the State were to introduce only the same evidence at the new trial and manage again to obtain a conviction. What then? Nor would an acquittal in this circumstance serve as a solution to the problem, because the constitutional guaranty is not against a second conviction, but against being placed in repeated jeopardy through trial.

Ill App 328, 346, involved reversal and remandment, but the case is distinguishable because the grounds for reversal in that case included numerous trial errors in the admission and rejection of evidence, and in the giving and refusing of instructions. Trial error was also the ground for reversal and remand in People v. Wolfson, 79 Ill App2d 309, 224 NE2d 581. People v. Noonan, 46 Ill App2d 63, 196 NE2d 501, is not in point.

However, Miller v. People, 90 Ill 409, 410, People v. Samuels, 366 Ill 406, 407, 9 NE2d 211, and People v. Martin, 380 Ill 328, 340, 44 NE2d 49, also cited by the State, are all cases in which the court reversed, not for trial error, but because of insufficient evidence to convict. In each of these cases the opinion contained language to the effect that since it appeared that the State would not be able to produce additional or more satisfactory evidence at another trial, the case would not be remanded. The fact remains that all of these cases resulted in outright reversals, so the decisions were consistent with the decision we reach in the instant case. And there have been, of course, hundreds, if not thousands, of cases in which convictions have been reversed without mention of the possibility of remand for a new trial. The language referred to is disturbing, however, as indicating that we should, by some process or other, determine the probability of success by the State in another attempt at conviction, and if the prospect were sufficiently sanguine, then we should send the case back for retrial.

It is our belief that this concept derives from the broad proposition, generally recognized to be true, that "where the accused successfully seeks review of a conviction, there is no double jeopardy upon a new trial." Bryan v. United States, 338 US 552. Earlier, the court had stated the rule to be that "a convicted person cannot by his own act avoid the jeopardy in which he stands, and then assert it as a bar to subsequent jeopardy."

295

Murphy v. Massachusetts, 177 US 155, 158. However, to apply this principle to every appellant—to one claiming the right to acquittal because the evidence was insufficient to convict, as well as to one asking for a new trial on account of trial errors—overlooks the subtleties of differentiation which lie within the double-jeopardy clause. The two situations have markedly distinguishable characteristics. Since, in the case before us, defendant sought from this court an adjudication of acquittal based upon lack of evidence, and did not ask for a new trial,[4] we are convinced that our conclusion to reverse without remand does not offend the line of cases which include the Bryan decision. Rather, it falls within our reading of Sapir v. United States, 348 US 373, and Forman v. United States, 361 US 416, 425–426, which recognize the controlling difference between these two situations in their relation to double jeopardy.[5]

We note that the Illinois Supreme Court cases relied on by the State were decided prior to Sapir and Forman. Other similar Illinois cases have been decided since then, but they do not refer to those authorities, and no point appears to have been raised which placed this matter before the court as a contested issue. E. g., People v. Evans, 24 Ill2d 11, 15, 179 NE2d 657. Still other opinions employing the same kind of language (concerning the apparent unavailability of additional evidence as the reason for not directing a new trial) are distinguishable

---

[4] He did make a motion for a new trial in the trial court, which motion was denied. Under Illinois law, that request has been abandoned, as any position or point not made in the reviewing court is deemed to have been waived and will not be considered. Supreme Court Rule 39, Ill Rev Stats (1965), c 110, § 101.39. See also new Rule 341, Ill Rev Stats (1967), c 110A, § 341(e).

[5] The Sapir case, in which a new trial had not been asked for, resulted in reversal for failure of proof, and remandment with instructions to dismiss the indictment. In the Forman case, a new trial was included in the relief requested and the reversal was based upon trial error, with remandment for a new trial.

from the case now before us since trial errors formed all or part of the basis for reversal. E. g., People v. Wolfson, 79 Ill App2d 309, 224 NE2d 581. Our own research has also disclosed that there are a number of Illinois Supreme Court cases in which convictions were reversed for insufficiency of the evidence and remanded for new trials. It appears, however, that in none of these was there any point made on the granting of the new trial. Most of this small group of cases were decided prior to Sapir (e. g. People v. O'Brien, 404 Ill 236, 88 NE2d 486), and in the later case of People v. Mosby, 25 Ill2d 400, 185 NE2d 152, the defendant expressly requested of the reviewing court that the conviction be reversed for failure of proof *and* that the cause be remanded for a new trial. Here again, no issue was made of the remandment, and our system of adversary proceedings was thus not in full operation for the benefit of the court. The court in People v. Jamison, 92 Ill App2d 28, 235 NE2d 849, under similar circumstances, reached a similar conclusion when the cases just referred to were relied upon by the defendant.

On the state of the cases in Illinois, we consider that the particular point with which we are confronted has not been specifically decided, although we expect that the Supreme Court will file a definitive opinion on this question in the near future, as there is a rather constant stream of cases in which the issue could be raised. In the interim, therefore, we are presenting our views on the subject for whatever value they may have.

While we are of the opinion that the decision in this case is supported by what we have set forth above, we should like to mention that we fail to comprehend any justification for recognizing a distinction between an appellant who asks for outright reversal with new trial relief (based on trial errors) only as an alternative, and an appellant who does not include such an alternate request in his appeal. See Sapir and Forman, supra,

wherein the Forman court appears to have given favorable consideration to Mr. Justice Douglas' concurring opinion in Sapir, commenting that "a decisive factor in Sapir's case" was the fact that he had not asked for a new trial. We can think of no reason in fairness and justice why a defendant on appeal should be required to discard his right to seek a new trial based on trial errors, in order to validate his right to seek an outright reversal for lack of evidence. In any sensible consideration of his position the former is seen to be a second-choice alternative to the latter. If his double jeopardy rights are deemed to have been waived by his request for a new trial, the waiver should then take effect only if the reversal is granted for the reasons contained in the new trial request, and, if the conviction is reversed for lack of evidence, the waiver contained in an accompanying request for a new trial would never become operative.

 Furthermore, we question whether the theory of waiver is appropriately applied in these cases to either situation. A true waiver is a "voluntary knowing relinquishment of a right." Green v. United States, 355 US 184, 191; and see 31 U Chi L Rev 365, 368. More and more in the field of criminal law a defendant's waiver is set aside or ignored unless the court is first satisfied that it is an intelligent and understanding waiver rather than one which is pro forma or fictitious. For example: Carnley v. Cochran, 369 US 506, 513 (waiver of right to counsel); People v. Turner, 80 Ill App2d 146, 225 NE2d 65 (waiver of right to jury trial); People v. Fitzgerald, 91 Ill App2d 191, 234 NE2d 79 (entry of guilty plea). Surely, it is a legal fiction to assume, without judicial inquiry, that an appealing defendant has been fully advised by his counsel that (1) while asking for reversal for lack of evidence, he will also, in the alternative, rely on trial errors in order to get a new trial; (2) that the defendant will therefore have to waive his

right not to be tried again even though the appeal might turn out to be successful on the first point; and (3) that the defendant has then, in every case, knowingly, intelligently and understandingly waived such right. We can't picture it. Neither can we visualize a true waiver as being present in any part of current appellate procedures.

If the theory of waiver is found wanting, and we conclude that it is (Green v. United States, supra), then on what ground can a defendant ever be tried again after reversal? [6]

In United States v. Berry, 309 F2d 311, 313, the Court for this Circuit held that there was a "continuity of jeopardy" from its original attachment in the first trial, through appeal and reversal [7] to final disposition of the charge on a new indictment at the second trial. The Supreme Court in the Green case, however, while finding that the principle of waiver was "totally unsound and indefensible," looked with equal disfavor on the theory of continuing jeopardy. The concept of continuing jeopardy had been advanced by Justice Holmes in his concurrence to Kepner v. United States, 195 US 100, but the Green court pointed out that the Holmes theory had been "consistently rejected" by the court and had

---

[6] We make note here of the fact that under English law the reviewing court is powerless to remand for a new trial unless the original trial was a nullity for some reason such as lack of jurisdiction. See 4 Stephen, Commentaries on the Laws of England (21st ed 1950), at page 284.

See also Connelly v. Director of Public Prosecutions, 2 All ER 401 (1964), where it was stated in the opinions of the House of Lords that retrial is not permitted "in respect of the same offense after the verdict of guilty has been quashed on any ground by the Court of Criminal Appeal." (Page 406.) And further that such a decision by the reviewing court "can be regarded as placing the appellant in the same position as he would have been in if the jury had returned a verdict of not guilty." (Page 408.)

[7] In the original proceedings, reversal and remandment had been based solely upon trial error. United States v. Berry, 277 F2d 826.

299

"never outwardly been adhered to by any other Justice of this Court." 355 US 184, 196–197.

There are other opinions which consider that a setting aside of a conviction permits a second trial because the first trial may then be treated as though expunged from the record, or as though it had never taken place.[8]

---

[8] This appears to be the position taken in the drafting committee comments to the Illinois Criminal Code of 1961. SHA c 38, § 3–4, page 140. There the statement is made in connection with a statutory declaration of a defendant's double jeopardy rights:

"Another obvious qualification is that if the former conviction has *ceased to exist* because of the action of a reviewing court upon either direct or collateral attack—invalidation, setting aside, reversal, or vacating—it does not constitute a bar to the subsequent prosecution unless the effect of the reviewing court's action was to acquit the defendant." (Emphasis supplied.)

Six cases are then cited in support, but we note that in each of these cases the setting aside of the first conviction was accomplished either by the trial court on the defendant's motion for a new trial, or by the reviewing court on reversal for trial errors.

The statute to which these committee comments apply reads in pertinent part:

§ 3–4. Effect of Former Prosecution

(a) A prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts, if such former prosecution:

 (1) Resulted in either a conviction or an acquittal or in a determination that the evidence was insufficient to warrant a conviction;

· · · · · ·

(d) However, a prosecution is not barred within the meaning of this Section 3–4 if the former prosecution:

· · · · · ·

 (2) . . . or if subsequent proceedings resulted in the invalidation, setting aside, reversal, or vacating of the conviction, unless the defendant was thereby adjudged not guilty.

Subparagraph (a), just quoted, raises a question apropos of our consideration as to whether a reversal for insufficient proof might not properly be deemed "a determination that the evidence

300

E. g., State v. Robinson, 100 Ohio App 466, 137 NE2d 141 (1956). Unless the conviction is based upon truly void proceedings, this seems to us an untenable position, in conflict with the plain meaning of the language employed in the Fifth Amendment as well as with its general purpose.

 We come to the conclusion, therefore, that a second trial after reversal does constitute a second jeopardy which is, nevertheless, countenanced in some cases because required in the interest of justice.[9] The

---

was insufficient to warrant a conviction." The statute does not limit such determination to the trial court, and it could very well be interpreted as covering a reversal for insufficient evidence.

As to the quoted part of subparagraph (d), the same question arises as to whether a reversal for insufficient evidence has the effect of adjudging the defendant not guilty. Again, we think this might well be the result. There have been no cases construing either clause, so far as we know.

[9] We believe this to be consistent with general language used in People v. Benson, 24 Ill2d 159, 163, 180 NE2d 483 (a case not here in point on the facts) where the court said, "We think it clear that defendant by appealing his former conviction subjected himself to whatever appropriate action might be taken by this court." Our problem in the instant case thus becomes one of determining the "appropriate action."

We note in passing that the Benson opinion included the statement that "the retrial of an accused, after a judgment of conviction has been reversed and the cause remanded, does not justify a claim of double jeopardy." (Page 162.) In support of this principle three cases were cited, all of which involved reversal and remandment for trial errors, not for insufficiency of the evidence. People v. Keagle, 7 Ill2d 408, 131 NE2d 74; People v. Woodward, 394 Ill 433, 69 NE2d 181; Stroud v. United States, 251 US 15.

Other cases cited in Benson involved reversals for trial errors (Murphy v. Massachusetts, 177 US 155, and Lane v. People, 5 Gilman 305); the granting of a new trial on motion of the defendant in the trial court (Gannon v. People, 127 Ill 507, 21 NE 525); and waiver of the double-jeopardy defense by failure to raise the point in the trial court (People v. Scales, 18 Ill2d 283, 164 NE2d 76).

basic concern of the criminal law in preserving the delicate and difficult balance between the security of the community and the rights of the individual accused, has dictated the rule that a criminal defendant who is successful on appeal may be retried. But this rule should not be applied to all reversals. When a conviction is set aside because of prejudicial occurrences or trial errors, the reviewing court determines only that the accused did not receive the fair trial which was his due; it does not determine that he was entitled to an acquittal. In this type of case, therefore, the security of the community requires retrial. At the same time, the new trial in such a case does not constitute an infringement of the rights of the accused because he will then receive the fair trial which had been denied him—precisely the relief to which he is entitled under the circumstances, and, with no exceptions known to us, the relief specifically requested by the appellant.

On the other hand, when an accused is acquitted at trial, or when his conviction is reversed on appeal because of the insufficiency of the evidence, the results are the same so far as his relationship with society is concerned. He cannot reasonably be deemed a continuing danger to the community in one instance and not in the other. These extremes in result should not be left to the fortuitous circumstance of what court it is which decides that there was not enough evidence to establish his guilt. Here, therefore, the balance is seen to be tipped the opposite way, since there can be no infringement of the right to community security when the defendant is released on this ground by either court, whereas, in our opinion, his right against double jeopardy would be denied equally by a retrial order in either court.

The reason for the reversal should thus control the decision as to whether or not there should be another trial.

302

We previously reached a similar conclusion, without explanation, in People v. Brown, 66 Ill App2d 317, 319–320, 214 NE2d 289. See also State v. Moreno, 69 NM 113, 364 P2d 594, 595.[10]

The Petition for Rehearing is denied and the opinion will stand as filed.

DRUCKER, J., concurs.

McCORMICK, P. J., concurs in the denial of the Petition for Rehearing but does not agree with all that is said in the supplemental opinion.

---

[10] Citing the Sapir case, the court stated, "The effect of a reversal for lack of sufficient evidence to support a conviction is not different from an acquittal by the jury and requires that the defendant be discharged."