IDA TITTLEBAUM *v.* PENNSYLVANIA RAILROAD COMPANY.

[No. 57, April Term, 1934.]

398

*Decided July 6th, 1934.*

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Harry O. Levin.* for the appellant.

*Charles T. LeViness, 3rd,* and *Hargest, LeViness, Duckett & McGlannan,* for the appellee.

PATTISON, J., delivered the opinion of the Court.
The appellant, Ida Tittlebaum, a young woman twenty-

three years of age, who had bought a ticket entitling her to passage on appellee's train from Baltimore to Philadelphia, boarded the latter's train at Baltimore, at 2:10 p. m., on November 19th, 1932. She was accompanied by Thomas J. Hutson. They occupied a seat near the center of the coach on the right-hand side. The appellant was seated next to the window and Hutson next to the aisle. About fifteen or twenty minutes after the train had left Baltimore, going at the usual rate of speed and when between Back River and Chesaco, a window on the left-hand side of the coach, across the aisle from the appellant, one section front, was suddenly shattered and particles of glass were cast or thrown over to the opposite side of the coach, striking and cutting the appellant in the face, and some of the fragments of the glass entered her right eye. The plaintiff claimed, as a result thereof, that she was seriously and permanently injured about the head and eye, and she brought suit against the appellee, the railroad company, to recover for the injuries suffered by her. The case when heard resulted in a verdict and judgment for the defendant. From that judgment the plaintiff has appealed to this court.

In the trial of the case five exceptions were taken to the rulings of the court. The first, second, third, and fourth were to rulings upon the evidence, and the fifth to rulings on the prayers. The first, second, and fourth exceptions have been abandoned, leaving only the third and fifth exceptions to be reviewed and passed upon by us.

The plaintiff testified that while "she was riding along * * * talking to Mr. Hutson, she heard nothing but the shattering of glass," which cut her on both sides of her face, but mostly on the right side, and some of the particles of the glass entered her right eye, "as she was facing the left side of the car." Thereafter she was unable to open her eyes and consequently did not notice the window after it was broken. That she did not know what caused the window to be shattered. She did not think any trains were passing on the other tracks.

Hutson testified that he was seated beside the plaintiff next to the aisle, and "while seated there and talking, just like a flash this window broke and the glass came over" on the right side of the car. Then the plaintiff hollered, "There is something in my eye." He saw the glass come from the side of the car opposite to them, about one seat ahead. That he looked at the window; it was smashed. Nobody was seated in the seat next to the window at the time it was shattered. The person who had been seated there had a few minutes before walked to the front of the car, leaving his overcoat and grip in the seat. That, after the glass was shattered and she struck by fragments of it, she was taken to the diner by the conductor and was there given an antiseptic, and cool water was applied to her eye. Upon reaching West Philadelphia a doctor there extracted something from her eye.

On cross-examination Hutson testified that he did not notice what the window looked like after the break. That at the time the window broke there was no train passing on the other track. And that the train they were on was running at the usual rate of speed when coming out of Baltimore. "He did not feel or know anything unusual about the manner at which the train was being operated."

P. J. Wood, the conductor on the train upon which the accident happened, testified that, in accordance with his custom, "he went through the car and made an inspection of it and discovered nothing wrong with any of the window glass * * *. That he first learned that a window was broken when he came into the car * * * and looked for the stone" with which he suspected the window had been broken but found none. "That there was a hole in the window, a ragged edge, probably a little smaller than his fist. Nobody was sitting in the seat, there was glass all around. That the part of the window that was left in the sash was intact with the exception of a few cracks. It was not broken away from the sash at any part. That the sash was in good condition, that is, not broken at all" and "the hole was very near the center. The fragments of the window pane were scattered around five or six feet from

the window. That the gentleman * * * that was with the plaintiff told him that the plaintiff had been hurt." He "then took the lady and gentleman back into the dining room and looked into her eye but could see no visible signs of injury. * * * That when they got off at West Philadelphia that was the last time he saw her." On cross-examination the witness testified that "he made his inspection before he left Washington and before he took on any passengers."

James E. Fyre, employed as "inside car repairman," testified that it was his duty "to go through all passenger trains and make an inspection, and, if necessary, repairs." That he was on duty on the day of the accident. The train upon which it occurred left Washington at 1 o'clock in the afternoon. On that day he made the inspection of the car upon which the plaintiff was a passenger. He stated "that in making the inspection they inspect all doors and door locks, window glass, curtains of all kinds, seats and anything that pertains to the interior of the car, and that on this particular day in question, when he made his inspection of the cars on the train" mentioned, "he found nothing the matter with the cars. That at the time he made the inspection the glass in all the cars was in good condition."

William Hoblick, a boy ten years old, and in the fifth grade at school, when offered by the defendant as witness, testified that he lived on Rosedale Avenue near Chesaco and close to the Pennsylvania Bridge over Back River. That on the afternoon of the accident he with two other boys, Tom and John McIlvain, who lived near to him and older than he, were down on Back River "by the tracks of the Pennsylvania Railroad. * * * We were throwing bricks in the water and all of a sudden we heard a train coming up (from Baltimore) and then I called to Tom and John that the stuff (meaning the cinders of the passing train) was going to get in our hair. And then we ran around on the ashes until we came to a pipe along the cement walk," a water pipe. "And then Tom picked up a brick and told us he is going to bust a window." A mo-

tion to strike out this answer of the witness was overruled and it was from this ruling that the third exception was taken, the only exception upon the evidence to be passed upon by us. The witness, continuing with his answer, said: "And he (Tom) was standing on the pipe and me and Johnny was down in the bottom of the pipe, and just as the train went by, he (Tom) brought back his arm and threw it (the brick), and we ran home." When asked, did you see what the brick did? He replied: "No, we could not see, on account of the wall. Ques. That is, you were down below the wall, like, and Tom was up higher? Ans. Yes sir. Ques. He was up on the pipe? Ans. Yes sir, on top of the pipe."

We will first consider the third exception, the one to the ruling of the court in refusing to strike out the answer of the boy witness, Hoblick, in which he said, in response to a question asked him, "and then Tom picked up a brick and told us he is going to bust a window." The witness had already stated that about two o'clock on the afternoon of the accident, he, Tom, and John McIlvain had gone to Back River at or near the place of the accident, and they, while throwing bricks into the water, heard a train coming from the direction of Baltimore and from fear of getting cinders in their hair they went to a water pipe. Tom, it seems, got upon the pipe, while the witness and John got into a position in which they were in some way protected from the flying cinders. It was then that Tom picked up a brick and said he was going "to bust a window." The witness was interrupted in further answering the question by the objection made to so much of the answer, and, upon the objection being overruled, he continued, and said: "And he, Tom, was standing on the pipe and me and Johnny was down at the bottom of the pipe, and just as the train went by he brought back his arm and threw it (the brick)." The ground of the objection to the answer made was that it was hearsay evidence.

The court was obviously right in holding this evidence admissible. It was not, as claimed by the appellant, objectionable on the ground that it was hearsay evidence.

It was, as stated by the trial court, a part of the transaction or a part of the *res gestae*. It was a declaration of the party accompanying the act committed by him, where the declaration was heard, and the act seen by the witness. He not only said he was going to burst a window (meaning the window of the approaching train), but he was seen by the witness to throw the brick in the direction of the passing train. It is true that the witness did not see where the brick struck, but this fact cannot have the effect of rendering the evidence, so far as it went, inadmissible. *Wigmore on Evidence*, vol. 3, secs 1745, 1746 and 1747; *Jones on Evidence* (Pocket Ed.) p. 434, sec. 348 (351).

At the conclusion of the evidence, both that of the plaintiff and defendant, two prayers were offered by the plaintiff which were granted. Seven instructions were asked for by the defendant. Of these its "A," "B," fourth, and fifth prayers were refused; the others, its first, second, and third prayers, were granted.

By the plaintiff's second prayer the jury were told: "That if they find from the evidence that the plaintiff was a passenger for hire on a train of the defendant, and while a passenger she received the injury complained of, then the presumption is that the injury resulted from the negligence of the defendant and plaintiff is entitled to recover unless the jury find from the evidence that the injury did not result from the negligence of the defendant." While by the defendant's second prayer the jury were instructed: "That the mere injury of the plaintiff while passenger on the lines of the defendant raises no presumption that such injury was caused by the negligence of the defendant, and the burden is upon the plaintiff to prove how the accident was caused which resulted in the injury of which she complains and unless the jury finds that the cause of said accident was one against which the highest degree of care and foresight could have guarded and was the result of negligence of some degree on the part of the defendant, the verdict shall be for the defendant."

The plaintiff contends, and properly so, that the instructions contained in the second prayer of the defendant are inconsistent with the instructions contained in the plaintiff's second prayer, inasmuch as the jury were told by the plaintiff's prayer that there was, upon the fact stated, a presumption that the injury resulted from the negligence of the defendant, while by the defendant's prayer they were told that upon such fact there was no such presumption. It is because of this inconsistency in the two prayers that the plaintiff contends the judgment of the trial court should be reversed. This is not the necessary effect of inconsistent granted prayers. If the instructions in the plaintiff's prayers were wrong and those in the defendant's prayers were right, such inconsistency, when the verdict was in favor of the defendant, would not have the effect sought by the plaintiff. There must be concurrence of error and injury to constitute a reversible error. *Meyer v. Frenkil,* 116 Md. 411, 82 A. 208.

We are therefore to determine whether the instructions contained in the plaintiff's prayer were proper. This prayer of the plaintiff is predicated upon the application of the doctrine of *res ipsa loquitur,* which in our opinion does not apply to this case.

This court, speaking through Judge McSherry, in *Benedick v. Potts,* 88 Md. 55, 40 A. 1067, 1068, in discussing the doctrine of *res ipsa loquitur,* said: "This phrase, which, literally translated, means that 'the thing speaks for itself,' is merely a short way of saying that the circumstances attendant upon an accident are themselves of such a character as to justify a jury in inferring negligence as the cause of that accident; and the doctrine which it embodies, though correct enough in itself, may be said to be applicable to two classes of cases only, viz.; 'First, when the relation of carrier and passenger exists, and the accident arises from some abnormal condition in the department of actual transportation; second, where the injury arises from some condition or event that is, in its very nature, so obviously destructive of the safety of person or property, and is so tortious in its quality as, in

the first instance, at least, to permit no inference save that of negligence on the part of the person in the control of the injurious agency.' *Thomas, Neg.* 574. But it is obvious that in both instances more than the mere isolated, single, segregated fact that an injury has happened must be known. The injury, without more, does not necessarily speak, or indicate the cause of that injury. It is colorless."

In 6 *Cyc.* p. 628, it is said of the doctrine here under discussion: "That the carrier is not an insurer against injuries to the passenger, and there is no implied contract that the passenger shall be transported safely. His right of action for injuries is based on negligence, and the burden of proof of negligence is on plaintiff. Therefore the mere proof of an injury to the passenger in course of transportation, which, so far as it is shown, might have occurred by reason of other cause than the carrier's negligence * * * will not make out a *prima facie* case. So also if it appears that the accident might have been the result of the wrongful acts or negligence of third persons * * * a *prima facie* case is not made out."

It was said by this court in the recent case of *State, use of Boznango, v. Electric Co.*, 162 Md. 84, 159 A. 106, 109, that: "If, by the evidence, * * * it was disclosed that the injury complained of might have been caused either by the defendant's negligence or by the act of another for which the defendant was not responsible then the doctrine would not apply." See *Stewart & Co. v. Harman*, 108 Md. 446, 70 A. 333; *Topp v. United Rwys. & Elec. Co.*, 99 Md. 630, 59 A. 52; *Strasburger v. Vogel*, 103 Md. 85, 63 A. 202; *Pillard v. Chesapeake Steamship Co.*, 124 Md. 468, 92 A. 1040; *Callis v. United Rwys. & Elec. Co.*, 128 Md. 406, 97 A. 715; *Baltimore & Yorktown Turnpike R. v. Cason*, 72 Md. 380, 20 A. 113; *Hagerstown Ry. Co. v. State, use of Cunningham*, 129 Md. 318, 99 A. 376; *Griffith v. Pullman Co.*, 142 Md. 514, 121 A. 362; *State, use of Chima, v. United Rwys. & Elec. Co.*, 162 Md. 404, 159 A. 916.

In the case now under consideration, the injuries resulted from the sudden breaking of a window pane across

the aisle from where the plaintiff was seated in the defendant's car. There is nothing to show that the accident was caused by any mechanical defect in the sash containing the glass or in the glass itself. On the contrary, it is shown by the defendant that the window a short time before, on the same day, had been examined or inspected and nothing was found wrong with the glass or the sash in which the glass was placed. Nor was any attempt made to connect the accident with any misfeasance on the part of the defendant, its agents or employees, in the operation of the train. It was shown that at the time of the accident no train was passing the one in which the plaintiff was seated, by which the glass in some way might have been broken; nor was there any evidence offered in the case tending to show that the accident complained of was in any way due to the negligence of the defendant, or that the cause of this accident was confined to the acts of the defendant, and could not have been caused by others, for whose acts the defendant would not be responsible; but as a matter of fact, there was evidence offered by the defendant strongly tending to show that the accident was caused by the boy, Thomas McIlvain, who was in no way connected with the defendant and for whose acts the defendant was in no wise responsible.

The jury, we think, as we have already stated, were wrongfully instructed by the plaintiff's second prayer, and as the instructions contained in the defendant's second prayer correctly stated the law of the case and the verdict was in its favor, we find no reversible error in the plaintiff's second prayer. In fact, we think the case should have been taken from the jury upon the defendant's A and B prayers; to the refusal of which no exceptions were taken.

As we find no reversible error in the court's rulings, the judgment of the trial court will be affirmed.

*Judgment affirmed, with costs.*