RONALD RUDOLF MOORE *v.* STATE OF MARYLAND

[No. 1043, September Term, 1974.]

*Decided June 3, 1975.*

The cause was argued before MOYLAN, MENCHINE and LOWE, JJ.

*John E. Bohlen, Jr.,* with whom was *Harry C. Davison, Jr.,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *David H. Hugel, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Ronald Rudolf Moore, was convicted in the Circuit Court for Baltimore County by Judge Walter R. Haile, sitting without a jury, of child abuse. Upon this conviction, he raises three contentions:

(1) That hearsay evidence was erroneously admitted into evidence against him;

(2) That a hospital record, also ostensibly hearsay, was erroneously admitted into evidence against him; and

(3) That the evidence was legally insufficient to sustain the conviction.

Under the first contention, the testimony in dispute is that of Dr. Constantinos P. Chilimindris, a general surgeon and specialist in traumatology, who on July 20, 1974, was assigned to the trauma service of the intensive care unit of the Greater Baltimore Medical Center. The victim in this case was David John Updegraff, a three and one-half year old child. He was admitted to the Greater Baltimore Medical Center at approximately 11:30 p.m. on July 19. Dr. Chilimindris saw the child first in the Emergency Room at 2 a.m. on July 20. He described the child's condition in the following terms:

"A. . . . The child was a white child and was in acute distress. His color was almost ashen. He had

visible multiple injuries and was crying from pain, pain mainly in his abdomen.

Q. How would you describe his visual injuries; what type were they?

A. Due to inspection through one's eye, one would see evidence of bruising in the face and chest and abdomen.

Q. Yes. Please continue with your observations or what you observed at that time.

A. The child's further signs were extremely abnormal. His pulse was very fast, about double the normal. His blood pressure was low, about half of normal. His respiration was fast and there was — these signs were indicative of loss of blood. The child was still conscious and able to answer some questions but he was in extreme acute distress from pain and shock. On examination of his head and face, there was some bruises in the area of the chin but that is about all there. The neck was normal but examination of the chest revealed extensive bruising of the front of the chest. These bruises were small in size, about, as I described in my notes, as one to, one-and-a-half centimeters in diameter. Some of them were confluent; in other words, one running into another. The lungs were clear. There was no lung injury and there was no heart injury except that the heart rate was fast, indicative again of blood loss. Examination of the abdomen, commonly known as the stomach, showed again, through inspection, a great deal of bruises, especially in the upper half of the abdomen. Again, some of these were varying from two to two-and-a-half centimeters in diameter, confluent, and palpation of the abdomen to the hand, there was generalized tenderness. In other words, what we call rebound tenderness. When one presses the hand and lets go, the child has more pain when you let go than he does when you push down. The sounds of the bowel were diminished and

there was evidence of blood coming out of the patient's stomach from a tube which was introduced into the stomach and there was also bloody diarrhea while the child was lying on the examining table. He was incontinent of stool which contained blood and slime. . . .

. . . .

[M]edical treatment was already initiated by the time I arrived, treatment to combat shock by the administration of intravenous fluids and plasma. Blood was subsequently necessary to resuscitate the child. Various tubes were inserted in veins, in the stomach, in the bladder, and he was eventually transferred to the intensive care unit to be prepared for what I believed he needed, major surgery. . . . these x-rays were normal, there were no fractures, except the x-ray of the abdomen which showed the presence of fluid and paralysis of the bowel."

Dr. Chilimindris operated on the young child and made a number of repairs to close lacerations of internal organs in the abdominal area. The liver had been lacerated. The pancreas had been bruised. The operation lasted between one and one-half to two hours. The child remained hospitalized for eleven days. In the Emergency Room, prior to operating, Dr. Chilimindris sought for information as to the cause of the injuries. The answer he received from the three and one-half year old patient is the hearsay evidence now in issue:

"Q. At any time did he indicate how these injuries had occurred?

MR. BOHLEN: I'm going to object to that, your Honor. I think it is basic hearsay. We have a child that is three-and-a-half years old. I think it has nothing to do with the history. I don't think it's admissible.

THE COURT: In our experience we have had a very

high degree of accuracy with the doctors. Therefore, I think it will be an exception.

Q. (MR. HUGEL) Tell the Court what David said.

MR. BOHLEN: Do you overrule my objection?

THE COURT: It comes within the exception of the hearsay rule. It is kind of a first complaint to a treating physician and is within the exception, as I recall, and I therefore overrule the objection.

THE WITNESS: May I answer the question, your Honor?

THE COURT: Yes.

THE WITNESS: It is our duty and our job to ask our patients what happened to them, including children, and if they are able, have them tell us some information. I did ask this child as to why his tummy was hurting him and his answer to me in the emergency room was that Daddy was mad. Those were his words. He said, 'Daddy was mad, Daddy did it,' and any further questioning of the child revealed no further answers."

In response to the question as to "why his tummy was hurting him," the child declared, "Daddy was mad, Daddy did it." This, of course, is classic hearsay. The witness on the stand, Dr. Chilimindris, was recounting an out-of-court declaration by the three and one-half year old declarant which was being offered for the truth of the thing asserted — to wit, to prove that "Daddy did it." The declarant was not on the stand and, indeed, may have been incompetent (by virtue of age) to take the oath. He was not, therefore, subject to cross-examination.

We hold, however, that the out-of-court declaration was admissible in evidence upon a well-recognized and long-established exception to the Hearsay Rule — as an excited utterance which is a variety of the broader category known as spontaneous declarations.[1]

---

1. In this case, we will not rely upon the undifferentiated phrase *res gestae*, because that umbrella term covers a wide variety of analytically

### Testimonial Incompetence No Bar to
### Spontaneous Declaration

The initial and explicit thrust of the appellant's challenge to the hearsay assertion, "Daddy did it," is that the testimonial competence of the three and one-half year old declarant was not established. By the same token, incompetence was not established; the child was not called as a witness and the issue of competence *vel non* was not before the court. The issue is, furthermore, irrelevant since the testimonial qualifications do not apply to spontaneous declarations. In dealing with the declarant of an excited utterance, 6 *Wigmore on Evidence* (3d Edition 1940) said at § 1751, p. 156:

> "Does the disqualification of *infancy* . . . exclude declarations otherwise admissible? It would seem not; because the principle of the present Exception obviates the usual sources of untrustworthiness . . . in children's testimony; because, furthermore, the orthodox rules for children's testimony are not in themselves meritorious . . . and, finally, because the oath-test, which usually underlies the objection to children's testimony, is wholly inapplicable to them."

To the same effect, see McCormick, *Law of Evidence* (1st Edition 1954) at 582:

> "Must the declarant be shown to have met the

---

distinct rationales, including excited utterances; declarations of both present bodily condition and present mental condition (if contemporaneous with the event in issue); declarations of present sense impression (if contemporaneous with the event in issue); either admissions by a party or declarations against interest (again, if contemporaneous with the event in issue); and utterances (or verbal acts) which are themselves operative conduct or utterances which are a part of relevant conduct, which latter categories are, of course, non-hearsay rather than exceptions to the Hearsay Rule. Events do not speak; only people do, and they may speak truthfully for a variety of reasons. In the case of non-hearsay, it doesn't matter whether they speak truthfully or not. We do not by any means imply that trial courts using the broader term are in error. A right ruling is a right ruling, however undifferentiated the articulation of its rationale. We deem it our function, however, at least to make the effort to be analytically precise.

tests of competency for a witness? In general, it seems not. The declarant is not usually before the court to be examined as to his competency, and the declarations furthermore come in only under special safeguards — here, the requirement of *excited* utterance — which diminish the need for further caution. Consequently, it is held that evidence of spontaneous declarations of infants is admissible despite the incompetency of the child as a witness. Such is also the rule in the case of an insane declarant, or one incompetent by reason of conviction of a felony, or where the declaration was made by the husband or wife of the accused in a criminal case."

If the declaration of the child is shown to qualify as a legitimate exception to the Hearsay Rule in other respects, it will not be deemed incompetent because of the tender age of the declarant.

### Excited Utterances as an Exception to the Hearsay Rule

Two factors combine to permit the admission of certain classes of hearsay — 1) necessity and 2) the circumstantial probability of trustworthiness. In the case of spontaneous declarations generally, there is no requirement that the declarant be unavailable. The necessity rather arises out of "the superior trustworthiness" of the spontaneous declarations. 6 *Wigmore*, § 1748, "The Necessity Principle; Death, Absence, etc., need not be shown," pp. 138-139. The circumstantial probability of trustworthiness underlying this exception (as well as the superior quality of the evidence) has been thoroughly explored and well set out by the recognized authorities in this field. Dean Wigmore said at § 1747, "General Principle of the Exception":

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and

removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts."

Professor Morgan turned his astute analysis upon this exception in Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 Yale L. J. 229, 238 (1922):

"As in the preceding class, the utterance is offered for its truth and is hearsay. Its sole guaranty of trustworthiness lies in its spontaneity. The essentials of this theory are found in the early case of *Thompson v. Trevanion,* around which Lord Ellenborough cast the fog of *res gestae,* and which Chief Justice Cockburn repudiated in *Bedingfield's Case.* In this country but few cases prior to 1880 gave weight directly to the element of spontaneity, and fewer still to the fact that spontaneity was insured by the startling nature of the event. Indeed contemporaneousness rather than spontaneity was emphasized, although the latter was clearly recognized as highly important. Thereafter such cases are somewhat more numerous; but it is only since the publication of Dean Wigmore's work that this exception to the hearsay rule has gained wide recognition. It is, however, by no means universally accepted, and nowhere is the theory of the exception applied with logical completeness. If

spontaneity of itself is to be accepted as a guaranty of trustworthiness, then the subject matter of the declaration should not be limited to the startling event which operated to still the reflective faculties. Yet it is everywhere so limited. There is also a marked tendency in many cases to assume that contemporaneousness of utterance and event is a requisite of admissibility, and to argue that it is satisfied where the facts show the utterance unreflective, instead of using lapse of time between event and utterance merely as evidence of lack of spontaneity."

*McCormick* adds his endorsement and analysis at § 272, "Excited Utterances (Spontaneous Exclamations)," pp. 578-579:

"From the mists of *res gestae* there has emerged, under Wigmore's discerning analysis, an exception to the hearsay rule for statements uttered under stress of excitment produced by a startling event and made before the declarant has had time or opportunity to reflect or contrive. The factor of special reliability is thought to be furnished by the excitement which suspends the powers of reflection and fabrication. Again, as in the other cases of 'spontaneous' statements in this chapter, this factor of special reliability serves to dispense also with any requirement that the declarant be unavailable as a witness, on the view that even his testimony on the stand would be less reliable than the statements made under the excitement of the event. Psychologists would probably concede that excitement stills the voice of reflective self-interest but they might question whether this factor of reliability is not over-borne by the distorting effect which shock and excitement have upon observation and judgment. But they might well conclude that contemporaneous statements

both excited and unexcited are so valuable for the accurate reconstruction of the facts that the need is not to narrow the use of excited statements but to widen the exception to embrace as well unexcited declarations of observers near the time of the happening.

At any rate, excitement flowing from a startling event is the key requirement now. Under prevailing practice the declaration itself seems to be taken as evidence of the fact of the happening of the startling event."

An excellent exposition of the theory underlying this exception is found in Strahorn, *A Reconsideration of the Hearsay Rule and Admissions*, 85 U. of Pa.L.Rev. 484, 506 (1937):

"In the situations permitted by the exception there is superiority in the elements of perception, recollection, and narration, and, because of the startling event, absence of possibility of motive to falsify. That the witness was startled by the event indicates that he must have been attending the fact of the event, i.e., the subject matter of his perception. The startling nature of it creates that 'intent to remember' which, psychologically speaking, improves recollection. The requirement that the narration be made before the effect of the event wears off indicates that the interval between perception and narration is of the briefest. Then there are avoided dangers of faulty recollection. The danger of error in choice of words for narration is probably a normal one in such a case, but the usual events producing spontaneous exclamations are of such a nature that there is little likelihood of the choice of the wrong words for description. The same factors make for less than normal chance of error in reproducing the fact of the utterance in the courtroom. The witness who heard the spontaneous

exclamation probably attended well to the fact of its utterance in view of the startling event happening at the time. It is also probable that his recollection was better than usual because of the vivid nature of the fact. As his narration consists of the quotation of a small group of words there is little chance of his making an inept choice of phraseology."

Although adhering to the older usage of *res gestae*, Maryland has firmly endorsed the principle of the "excited utterance" exception to the Hearsay Rule. *Wright v. State*, 88 Md. 705, 41 A. 1060 (1898); *Baltimore City P. R. Co. v. Tanner*, 90 Md. 315, 45 A. 188 (1900); *Neusbaum v. State*, 156 Md. 149, 143 A. 872 (1928); *Montgomery Bus Lines Co. v. Diehl*, 158 Md. 233, 148 A. 453 (1930); *Tittlebaum v. Pennsylvania R. Co.*, 167 Md. 397, 174 A. 89 (1934); *Grier v. Rosenberg*, 213 Md. 248, 131 A. 2d 737 (1957); *Stevens v. State*, 232 Md. 33, 192 A. 2d 73 (1963); *Reckard v. State*, 2 Md. App. 312, 234 A. 2d 630 (1967); *Hicks v. State*, 3 Md. App. 225, 238 A. 2d 577 (1968); *Price v. State*, 5 Md. App. 127, 245 A. 2d 600 (1968); *Hall v. State*, 5 Md. App. 599, 249 A. 2d 217 (1969); *Smith v. State*, 6 Md. App. 581, 252 A. 2d 277 (1969).

In the case at bar, this three and one-half year old child was in acute distress and suffering significant pain in a hospital emergency room within hours after the inflicting of massive injuries. It is stating the obvious to hold that the trial judge did not abuse his discretion in concluding that the declaration in issue was surrounded by substantial guarantees of trustworthiness and was not uttered designedly with a view to making evidence. Under those circumstances, it was clearly admissible.

A case such as this illustrates the wisdom of reposing in the trial judge, the man upon the scene, the ultimate discretion as to admissibility. It is he who can best assess the need and can best assess the circumstantial guarantees of trustworthiness. As was stated in McCormick, *Law of Evidence* (1st Edition 1954), at 562:

"[T]he trial judge has the duty to consider the circumstances under which the declarations were made and to determine (largely in his discretion) whether they were uttered spontaneously or designedly with a view to making evidence."

Judge Haile's decision here that the young child's declaration was "uttered spontaneously [and not] designedly with a view to making evidence" was not an abuse of discretion.

### The Hospital Record

The remaining contentions need not detain us long. The appellant's second contention is that improper use was made of a hospital record. It clearly appears from the transcript, however, that the hospital record was not introduced in evidence. The contention, whatever its merits in the abstract, has no factual predicate.

### Sufficiency of the Evidence

Nor is there any problem with the sufficiency of the evidence to sustain the conviction. The expert medical opinion of Dr. Chilimindris established the *corpus delicti*. The admissible declaration of the young child that "Daddy did it," helped to establish the criminal agency of the appellant. There was, furthermore, testimony that the young boy referred to the appellant as "Daddy." There was, moreover, an admission as to having "played" with the child made by the appellant to Dr. Chilimindris. There was finally a statement made by the appellant to the police that he was responsible for the injuries to the child. The verdict, therefore, was not clearly erroneous.

*Judgment affirmed; costs to be paid by appellant.*