THOMAS A. DELOSO, SR. *v.* STATE OF MARYLAND

[No. 1282, September Term, 1976.]

*Decided July 15, 1977.*

102

The cause was argued before MOORE, LOWE and MELVIN. JJ.

*Ralph H. France, II, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Poole & France* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *John S. Hollyday, State's Attorney for Washington County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court. MELVIN, J., concurs in the result and filed a concurring opinion at page 115 *infra.*

The corporal punishment of students constitutionally allowed teachers, *Ingraham v. Wright,* 430 U. S. 651 (No. 75-6527, decided April 19, 1977), was viewed in the early cases as derived from the parental right to discipline one's child. *Id.* at 651. It is unlikely that Thomas A. Deloso, Sr. foresaw the irony his actions would create when, on or about November 16, 1974, he administered corporal punishment to his daughter Jenny Jo, age five, which resulted in marks on her face [1] and a "whelp" or bruise on her back and right hip. When she arrived at school Jenny Jo called these marks to the attention of her teacher, who told the director of the

---

1. The school director observed that:

"She had red marks on her face, the right side of her face, she had blood on her gums, uh, she was bleeding in the gum area around one of her teeth, and she had marks on her back."

The other witnesses did not observe — or at least did not mention — the gum bleeding.

school, who told a social worker (Mrs. Broadwater), who told a doctor, who examined Jenny Jo at the hospital and found:

> "Physical exam — general appearance — well developed white female with inflamed contusions on upper back and right cheek. Remainder of exam within normal limits. Good range of movement in all extremities without pain."

The contusions occurred (as told by Jenny Jo to the director) when "her daddy had spanked her." Neither treatment nor medication was required. The child returned to school and no legal action was taken at that time.

Nearly five months later, on or about April 8, 1975, Jenny Jo was again punished by her father. This time she showed the results to two teachers,[2] who told the director and a member of Parent Involvement Aid, who told the vice-principal, who told Mrs. Broadwater of Social Services, who again told the doctor, who again examined Jenny Jo and found:

> "Contusions covering much of right buttock and right flank."

---

**2.** Mrs. Camphor who taught at the Noland Village Early Childhood Center testified:

"Q . . . Did you at that time notice anything about her?

A No, I didn't, Jenny called me. She said, 'Mrs. Camphor, come here, I would like to show you something.' And, uh, we went to another room where there weren't any other students and she pulled down her underwear and she showed me, uh, a bruise on her right hip.

Q Showed you what on her right hip?

A A whelp on her. It was a bruise mark on her right hip, and I then called our director who tried to get her attention again."

Mrs. Camphor testified that Jenny Jo told her that "her father had hit — beat her" — and although uncertain, thought Jenny had said with a belt.

Linda K. Dean was Jenny Jo's kindergarten teacher who was asked:

"Q And, what did you observe about her?

A She had a large bruise on her right hip.

Q And, how was this brought to your attention?

A The child openly said 'I want you to see something,' and she pulled down her pants on the one side and showed me the bruise mark."

Jenny Jo apparently told M's Dean that "her father had thrown her against the wall."

This time, Mrs. Broadwater acted:

> "Q All right, now, Mrs. Broadwater, then what else did you do after you took the child to the hospital in reference to your investigation?
>
> A This was the second time this had occurred in four months.
>
> Q So, what did you do?
>
> A I telephoned the Juvenile Court and described what had happened and asked if we might have an emergency commitment . . . ".

As a result of this teacher to case worker to court communication, appellant was indicted on June 6, 1975 for abusing his daughter. On January 12, 1975 he was convicted by a jury in the Circuit Court for Washington County of two counts of child abuse.

### hearsay or spontaneous declaration

For whatever reason, at trial the State chose not to call the child who was by then in the custody of foster parents (who themselves felt compelled to spank Jenny Jo during her stay), or Jenny Jo's case worker (who, it was stipulated, would have testified that she believes Jenny Jo to be a disciplinary problem and does have to be spanked occasionally). Virtually the only testimony introduced by the State was that of the teachers, the school director, and the social worker; [3] and, other than appellant's alleged admission to the social worker that

> " . . . he had hit Jenny on the back, because she had disobeyed him",

---

3. In addition to Mrs. Camphor's and M's Dean's testimony included regarding causation in n. 2, the director testified that Jenny Jo had told her

"that 'her daddy had spanked her' ",

and later that Jenny said

"he hit her with a brush."

The member of Parent Involvement Aid testified that Jenny

" . . . said her father hit her with a belt and pushed or threw her against the wall."

all of the State's testimony relevant to the charges was hearsay from the child, introduced over objection through the various persons and reports described. The trial judge admitted all of the hearsay under the "excited utterance" exception to the hearsay rule, relying upon *Moore v. State*, 26 Md. App. 556.

In *Moore* we held that an answer given by a 3 1/2 year-old hospitalized child to an examining physician's question "why his tummy was hurting him", while clearly hearsay, was admissible as an excited utterance under the spontaneous declarations exception to the hearsay rule. Although we set out at some length the underlying reasoning of the foremost text writers as to why an excited utterance was more trustworthy than ordinary hearsay, the *Moore* case was decided on a narrow factual basis, *i.e.*, a child in intense pain. We assumed that, when suffering, even children instinctively tell the truth to a physician.

Perhaps because we had occasion to draw upon the scholarship of *Moore* in *Jackson v. State*, 31 Md. App. 332 (where we held that statements inculpating the accused, made by a 4 year-old rape victim to her mother immediately upon arriving home after the assault, were admissible excited utterance exceptions to the hearsay rule), our holdings have been interpretively broadened by some trial judges to admit any relevant hearsay from an infant without regard to the prerequisite foundation of circumstantial probability of trustworthiness. See *Jackson, supra*, 31 Md. App. at 337; *Moore, supra*, 26 Md. App. at 562. While the writings of Professors Wigmore, McCormick, Morgan and Strahorn; from which we recited in *Moore*, make fascinating reading from an analytic and scholarly viewpoint, a trial judge called upon to rule during the climax

---

The physician's report stated on 11-15-74:
   "Child says father struck her on mouth and back with a brush."
On April 9, 1975 the report indicates that:
   "Child states father whipped her with his belt."

It is obvious from a careful reading of the record that some of the witnesses confused the dates of the incidents and the observations at each incident. Upon retrial, if that occurs, the State should more carefully interrogate its witnesses.

of a trial may find that their digestion was not completed at the time of their consumption. However, we are reminded of a judicial purgative wherein we reiterated a most lucid *res gestae* test from *Price v. State*, 5 Md. App. 127, 131-132:

> " ' . . . the declaration was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant. She was still emotionally engulfed by the situation. . . .' " *Smith v. State*, 6 Md. App. 581, 587.

This still seems a most practical rule of thumb for a trial judge, and an understandable test to apply on appeal as well.

The length of time between the occurrence and the declaration is a consideration in determining not only its spontaneity, but whether the declarant was "still emotionally engulfed", although, as is obvious from *Moore*, time is not a conclusive factor. The utterance need not be contemporaneous or simultaneous with the principal act. While it may be subsequent to it, it must be established that the exciting influence has not lost its sway or been dissipated by meditation. *Harnish v. State*, 9 Md. App. 546, 551. But the crucial factor is not so much the lapse of time or change of location but the continuance of a situation which insures that what is said is, in fact, a spontaneous reaction to the occurrence, rather than an independent, preconceived expression of the speaker's will. *Reckard v. State*, 2 Md. App. 312, 316-317.

Implicit in this consideration, however, is the requirement that the offerer of the hearsay statements provide the foundation upon which he asserts admissibility. See *Harnish, supra,* 9 Md. App. at 549-551; McCormick, *Evidence* § 297 (2d· ed.). As we have already pointed out, the State's entire case rested upon hearsay, but the State laid no foundation showing circumstantial probability of trustworthiness. Nor was there evidence of the relative time sequences between the alleged incidents of abuse and Jenny Jo's statements to the various witnesses. Nothing in the

evidence indicated that Jenny Jo "was still emotionally engulfed by the situation", either inferentially from time and circumstances, or actually from the witnesses' observations. To the contrary, Jenny Jo's conduct and conversation appeared from the telling to have been quite casual — almost a "show and tell" depiction. Neither *Moore*, *Jackson*, nor any other case reviewed by this Court permits the admission of the hearsay of a child simply by virtue of its tender years. The element of trustworthiness is generally found in the spontaneity of the exclamation, and that is totally lacking here. The facts in *Moore* permitted an exception to the hearsay rule — not an expansion of the exception. *Moore* did not abrogate the hearsay rule for child abuse cases.

### insufficient evidence, reverse or remand

Obviously then, we must reverse the judgments below. But because we are dealing primarily with the insufficiency of the evidence, the question arises whether we should remand for a new trial, reverse outright, or choose the middle course and leave that decision for the trial judge. In providing those alternatives, the Court of Appeals in *Gray v. State*, 254 Md. 385, 397, gave us some guidance on how to answer this question:

> "We conclude that if the record before the Court of Special Appeals indicates that additional probative evidence of guilt can be adduced by the State at another trial necessitated by the insufficency of the evidence, a new trial should be awarded after a reversal if the interests of justice appear to require it. If the record indicates that no additional probative evidence can be so adduced, the entry of a judgment of acquittal should be directed. If the Court of Special Appeals cannot determine from the record whether or not additional probative evidence can be produced on a retrial, and the interests of justice appear to require it, the Court should vacate the judgment

and remand the case with directions to the trial court (a) to hold a new trial if the State within a specified time can satisfy the court that it can produce additional probative evidence, or (b) to enter a judgment of acquittal if the State cannot preliminarily so satisfy the court."

At first blush *Gray* may offend one's sense of "fair play", which, while "peculiar to Anglo-American law", is so rooted in our theory of justice in America that most of us take it for a fundamental legal tenet. *Campbell v. State*, 37 Md. App. 89 (1977). *Gray* seems to say that the State may retry an accused if additional evidence is available, even where its first try failed for insufficiency of the evidence. Such logic appears to fly in the face of our double jeopardy concepts [4] notwithstanding the realization that the rule of *Gray* rests upon firm constitutional grounds.[5] But the Court of Appeals in *Gray* expressly ignored logic in favor of experience, 254 Md. at 398-399, and it subsequently admitted that *Gray* had "disturbed our sense of logic." *Couser v. State*, 256 Md. 393, 396. Nonetheless *Gray* is still recognized and adhered to by that Court, *Garrison v. State*, 272 Md. 123, 142, and we are bound to follow it even if we were reluctant to do so. See *Tisdale v. State*, 30 Md. App. 334, 345, n. 3.

However, stirred to further analysis by the warmth of the first blush of *Gray*, we find that the rule is not only ultimately logical, but that it also gives us a valuable judicial tool. It is not simply the availability of additional probative evidence which will compel a remand but the "interests of justice [must] appear to require it." The

---

4. The apparent illogic is based upon the fact that if an appellate court finds that the evidence is insufficient to sustain the conviction, it is in effect holding that the accused's motion for a judgment of acquittal should have been granted. If such a motion had been granted at trial, that disposition of the case would have concluded the matter and barred a reprosecution for the same offense. United States v. Ball, 163 U. S. 662, 671. The logical problem is posed by the fact that there is no essential difference between the granting of a motion for a judgment of acquittal and a finding upon appeal that the evidence adduced was insufficient to sustain the conviction.

5. See Bryan v. United States, 338 U. S. 552, which, since being relied upon in Gray, has been cited with approval in Forman v. United States, 361 U. S. 416 and United States v. Tateo, 377 U. S. 463, 465-467; see also Jeffers v. United States, U. S. (No. 75-1805, decided June 16, 1977).

"experience" of which the *Gray* Court spoke was based upon the protection of:

> " ' . . . the societal interest in trying people accused of crime, rather than granting them immunization because of legal error at a previous trial, and because it enhances the probability that appellate courts will be vigilant to strike down previous convictions that are tainted with reversible error.' "
> *Gray, supra,* 254 Md. at 399, quoting *United States v. Ewell,* 383 U. S. 116, 121.

The appealing ring of reason in that quote was more articulately expounded by Mr. Justice Harlan in *United States v. Tateo, supra,* 377 U. S. at 466:

> "Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest."

In short, *Gray's* "interests of justice" which must appear (along with the additional probative evidence), is, when stripped of its connotative associations, nothing more than a probability of guilt reflected by an appellate review of the trial record.[6] This determination is exclusively an appellate

---

6. Accordingly, the interests of justice would not require a new trial if the record affirmatively shows that the accused is not guilty of the crime charged. *See* LaFortez v. State, 11 Md. App. 598; Marston v. State, 9 Md. App. 360.

one, and is to be based solely on the evidence and proffers of either party, as revealed by the trial record, indicating the presence or reasonable availability of additional evidence.[7] Therefore, we must first determine if there is additional probative evidence and, if so, whether there is a sufficient likelihood of guilt — apparent upon retrial — to warrant that remedy.

### additional probative evidence

In the case at bar it is clear that there is additional probative evidence available, at least in a technical sense, since neither the victim nor her examining physician testified. But it was their testimony reflected through less reliable sources that brought about the convictions.

The evidence available from the victim would obviously have been of the highest probative value, yet the record does not indicate that the victim was submitted as a witness nor does it show that her qualifications to testify were objected to or even examined.[8] Speculatively, her testimony might have ranged from highly criminatory to completely exculpatory. In either event it would certainly be relevant. But since by all appearances the victim was readily available, we must assume that her testimony would have been cumulative, and that it would have added nothing of a probative nature to the State's case. In a case where the evidence is relatively thin, we cannot assume a diligent prosecutor would have withheld additional probative evidence so readily available. It would be both improper and

---

7. Parenthetically, it follows that if the case is remanded for the purpose of determining if a new trial is warranted, only "additional probative evidence" need be shown to the trial judge on remand to warrant retrial, and not that "the interests of justice appear to require it." If the appellate court decides to remand for the purpose of the trial level determination, it should have already decided from the record that the interests of justice require a new trial. That which is left wanting is the more practical concern of the availability of sufficient additional probative evidence to justify the retrial. We will have decided the esoterics; the trial court's concern is the practicality.

8. No competency question seems to have been raised by virtue of the child's age as in Jackson, *supra*. Indeed, the contrary is indicated because the State objected to the hearsay testimony of Jenny Jo's younger sister (4 years old), complaining that the child was "available to testify".

illogical for us to assume that a prosecutor would not "fire his best shot" at the initial trial, rather than hold anything back in anticipation of a retrial.

Nor can we discern from the record any reason for the absence of the doctor as a witness at the trial. Obviously the degree of force used by appellant in administering punishment to his daughter would have been highly relevant to the determination of whether it constituted "cruel and inhumane" treatment. Had the doctor been present, he might have more particularly described the "contusions" which he observed and if called for, perhaps given an opinion on the force necessary to so contuse. Without that opinion, or at the very least a descriptive observation, the jury was left to speculate whether the "contusions" he found were, as one witness described them, "whelps" which could arise from a less severe (though recently administered) physical chastisement, or whether they were deeper bruises which even laymen recognize as occurring from more extreme force. His testimony might have explored the ease or difficulty with which a five year old girl may be "bruised" — and he might have given an opinion as to the force necessary to so "injure without breaking the skin", which is the broad definition of a contusion. *The American Heritage Dictionary of the English Language,* see "contuse". But "what might have been" is speculative, and the record reflects no proffer or similar indication that if present the doctor would have added aught to this report. Although he, like the victim, would apparently be available to testify if we were to remand, there is nothing in the record to imply he could enhance his report, which was all the medical evidence that was admitted. Once again we cannot perceive a diligent prosecutor not having explored these possibilities if they existed. Accordingly, we must assume that the doctor's testimony upon retrial would add nothing to his report.

We hold that there is little or no possibility that the State would be able to adduce "additional probative evidence" upon a new trial.[9]

---

9. Although we can not state with absolute certainty that this evidentiary deficit could not be cured by evidence of which we have no

interests of justice

When reviewing the record we usually do so in light of the question raised on appeal of whether the evidence adduced was sufficient to sustain the conviction. In deciding whether to remand, however, we must assess the probability whether appellant might be convicted of child abuse at a new trial. Thus, we must consider all the evidence of record, the effect of the evidence in the record presently before us, the evidence the State can *probably* produce on retrial and whatever additional evidence the State can be expected to be able to produce.

From the evidence of record it is apparent that the degree of force administered by appellant, when reviewed most favorably to the State, was not so unreasonable in disciplining this child as to constitute "cruel or inhumane" treatment as required by the statute, Md. Code, Art. 27, § 35A, nor was the statutory alternative of malice on the father's part in any way indicated. Moreover, even if all the hearsay evidence that was adduced below had been admissible, and even if that "additional probative evidence" which would appear to be available upon retrial were to corroborate it, we still find it insufficient to sustain the conviction.

In assessing the probability of whether appellant may be guilty of the crimes charged for purposes of remand, it is also appropriate for us to consider the defense evidence of record, which was here introduced in the form of testimony of appellant and his wife. The defense evidence may give rise to the availability of evidence theretofore unknown to the State. In this case it did not do so but rather substantiated our view that a remand is not in the interests of justice.

---

inkling, the record provides nothing from which we can assume the availability of any additional probative evidence which would enhance the probability of guilt. But we are not persuaded that we must therefore remand the case to the trial court so that such remote possibilities may be explored. The rule of Gray is, as we have indicated, ultimately a rule of fairness and reason, and we must deal with probabilities rather than every speculative possibility. The "interests of justice", in its ordinary sense, do not require us in this case to protract the appellant's apprehension.

Appellant testified that all of his children constituted some disciplinary problems but that Jenny Jo was the worst.

"Yes sir. They do have a discipline problem, but since this, the rest of them listen pretty well, but I did have a problem with Jenny Jo especially. You tell her to do something and I've seen my wife tell her to do something and she'll just stand there and backtalk and 'No, I don't have to,' and, then, we make her do it, and then 'I'm going to tell my teacher,' and stuff like this."

Mrs. Deloso admittedly could do nothing with Jenny Jo and testified that whenever Jenny Jo was chastised or did not "get her way", she would threaten to tell her teacher. This unpleasant trait was also supported by appellant:

"But, for some reason or other she just has to have her own way. And, if she don't get her way, 'I'm gonna tell my teacher.' So, I just told her one day, 'Go ahead and tell the teacher, I don't care, because the teacher don't pay my rent and don't clothe her.' "

In addition, Jenny Jo developed the embarrassing attention-getting device of publicly "dropping her pants". While these problems gave concern, that for which she was punished occurred when she left the "court" where the family resided and to which she was restricted, to go to "Noland Court" where the traffic was dangerous and where she was at least once almost struck by a vehicle. Despite the parents' concerned efforts, this was repeated four or five times. These instances of disobedience corroborated the social worker's description of Jenny Jo as a disciplinary problem while in the foster home pending appellant's trial, and the foster parents having had to whip her during that time.

Appellant admitted having struck Jenny Jo on both of the occasions for which he was charged with having abused her.

The November incident arose when Jenny Jo had run off to "Noland Court" for the fifth time and appellant admitted:

"I slapped — I smacked her on the shoulder up here and told her to get on back to the house and then I made her stand in the corner."

He denied hitting her in the face, or hitting her with a hair brush on any part of her anatomy. He explained, however, that the morning following the fifth "Noland Court" episode, the two girls, Jenny Jo and her four year old sister, were:

". . . arguing about who was going to comb their hair first and who was going to brush their teeth first, so when I come down, 'Jen,' was crying.

Q You mean Jenny was crying.

A Jenny Jo was crying, yes, sir. I asked her 'What happened?' She just said 'she fell.' "

Appellant also admitted having whipped Jenny Jo with his belt on the April incident, but denied pushing or throwing her against the wall:

"Q All right. On this, therefore, on April 8 or the day before April 8, did you ever use a belt on her to punish her for running away again?

A Yes, sir, I did.

Q Where did you hit her with it?

A I hit her on her backside.

Q Now, did you during that session when you were hitting her with a belt, did you push her or throw her against the wall?

A No, sir, I did not.

Q After you finished spanking her with the belt, what did she do? Where did she go?

A Well, after I got finished with her with the belt, I just sat down in the chair and started taking off my work boots and she has a little place in the kitchen underneath the table that when you whip

her she'll crawl right underneath the table and set there for a little while until her tantrum is over."

According to Mrs. Deloso who also described that incident, the belt, without a buckle, was applied three times to the child's posterior:

"Well, that day she also ran off. So, we went looking for her that day, so when we found her, her father told her then that he was going to smack her. So, he took her in the house, and he got out his belt, and it has no buckle, and he smacked her three times on her behind."

Weighing the punishment inflicted, which required no treatment, against the explanation therefor, we cannot say that there is a probability of guilt; and certainly not factually that "the interests of justice appear to require" a new trial. To the contrary, our review of the evidence adduced or proffered clearly indicates that the question of child abuse should never have been, nor be, submitted to a jury.

> *Judgments reversed.*
> *Costs to be paid by Washington*
> *County.*

*Melvin, J., concurring:*

I concur in the result reached by the majority. I agree that the trial court erred in its ruling on the admissibility of hearsay evidence and that the error was not harmless. I also agree with the majority that the trial judge should have granted the appellant's motion for judgment of acquittal at the close of all the evidence on the ground that the evidence, including the hearsay testimony, was legally insufficient to warrant a finding by the jury that the appellant was guilty beyond a reasonable doubt of violating the child abuse statute.

I also agree that where we reverse on the ground of

insufficiency of evidence, we are bound by the Court of Appeals decision in *Gray v. State*, 254 Md. 385, (1969), regarding the propriety of accompanying the reversal with an award of a new trial or directions for the entry of a judgment of acquittal. I do not agree with the majority's dictum, however, that a retrial following a reversal on the ground of insufficient evidence "rests upon firm constitutional grounds" in every case. Where the insufficiency of the evidence results from an erroneous ruling of the trial court excluding material evidence offered by the State, I would agree that the interests of justice may require a retrial to "protect . . . the societal interest in trying people accused of crime, rather than granting them immunization because of legal error at a previous trial . . . ." *United States v. Ewell*, 383 U. S. 116, 121 (1966). In the absence of such legal error, however, where the State has had full opportunity to present all the evidence it has against a citizen and has failed in its proof, it would indeed be placing him in jeopardy for the second time to allow the State to have another go at him in the hopes that this time sufficient evidence can be produced to convict him. In my opinion, such a retrial would clearly violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

In *Green v. U. S.*, 355 U. S. 184 (1957), the Supreme Court of the United States said of the Double Jeopardy Clause, at p. 187:

> ". . . The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

I agree with the Appellate Court of Illinois when it said in *People v. Brown*, 241 N.E.2d 653 (1968), at pp. 659, 663-664:

> "Thus, the issue now presented is whether the State should be allowed a second chance to meet its burden of proof in a case in which (1) it had failed to adduce sufficient evidence to support a conviction at the trial, and (2) no material evidence offered by the State had been erroneously excluded or stricken. We are convinced that the State is not entitled to this kind of opportunity to rehabilitate its case at the expense of defendant's right to acquittal on the evidence which the State did see fit to present.
>
> "A necessary corollary to our conclusion (that the evidence was insufficient to support defendant's conviction) is that a judgment of acquittal should have been entered by the trial court. Had such a judgment been entered after a trial on the merits, defendant would have been discharged.
>
> "We come to the conclusion, therefore, that a second trial after reversal does constitute a second jeopardy which is, nevertheless, countenanced in some cases because required in the interest of justice. The basic concern of the criminal law in preserving the delicate and difficult balance between the security of the community and the rights of the individual accused, has dictated the rule that a criminal defendant who is successful on appeal may be retried. *But this rule should not be applied to all reversals.* When a conviction is set aside because of prejudicial occurrences or trial errors, the reviewing court determines only that the accused did not receive the fair trial which was his due; it does not determine that he was entitled to an acquittal. In this type of case, therefore, the security of the community requires retrial. At the same time, the new trial in such a case does not constitute an infringement of the rights of the

118

accused because he will then receive the fair trial which had been denied him — precisely the relief to which he is entitled under the circumstances, and, with no exceptions known to us, the relief specifically requested by the appellant.

"On the other hand, when an accused is acquitted at trial, or when his conviction is reversed on appeal because of the insufficiency of the evidence, the results are the same so far as his relationship with society is concerned. He cannot reasonably be deemed a continuing danger to the community in one instance and not in the other. These extremes in result should not be left to the fortuitous circumstance of what court it is which decides that there was not enough evidence to establish his guilt. Here, therefore, the balance is seen to be tipped the opposite way, since there can be no infringement of the right to community security when the defendant is released on this ground by either court, whereas, in our opinion, his right against double jeopardy would be denied equally by a retrial order in either court.

"The reason for the reversal should thus control the decision as to whether or not there should be another trial." (Emphasis added).

I think the reasons given for acquittal in *People v. Brown, supra,* apply with equal force to the case at bar and, were it not for our duty to follow the mandate of *Gray v. State, supra,* I would for those reasons alone vacate the judgment below and direct the entry of a judgment of acquittal.

Applying *Gray* to the instant case, as we are bound to do, I find that "the record indicates that no additional probative evidence can be ... adduced" by the State. The majority appears to agree with this, for it opines that "even if all the hearsay evidence that was adduced below had been admissible, and even if that 'additional probative evidence' which would appear to be available upon retrial were to corroborate it, we still find it insufficient to sustain the

conviction". Although the majority refers to the "additional" evidence as "probative", it finds such evidence "insufficient" to sustain the conviction even when added to the evidence produced at the first trial. To me this is a contradiction in terms. Black's Law Dictionary (Revised Fourth Edition, 1968), defines "Probative" as follows:

"In the law of evidence. Having the effect of proof; tending to prove, or actually proving.

"Testimony carrying quality of proof and having fitness to induce conviction of truth, consisting of fact and reason co-operating as co-ordinate factors [Citation omitted]".

"Probative Facts" is defined in the same work thusly:

"In the law of evidence. Facts which actually have the effect of proving facts sought; evidentiary facts. 1 Bench Ev. 18. Matters of evidence required to prove ultimate facts [Citation omitted]".

If the "additional" evidence that the record indicates may be adduced at a retrial is "probative" (i.e., has "the effect of proof" or "tends to prove" elements of the crime) then it would seem that such evidence is sufficient to make a jury issue of the crucial question of guilt. If the "additional" evidence is not "probative" then it is not sufficient to submit to a jury. In the present case, I agree with the majority that the "additional" evidence likely to be produced at a retrial is not sufficient to warrant submission to a jury. To repeat, "the record indicates that no additional *probative* evidence can be . . . adduced". Consequently, under *Gray's* mandate, "the entry of a judgment of acquittal should be directed". *Gray v. State, supra,* at 397. To reach this result it is not necessary, as the majority seems to think it is, to weigh all the evidence to determine "the probability of guilt" — a process I find foreign to the appellate function.